**BLECHER & COLLINS, P.C., Plaintiff,**

v.

**NORTHWEST AIRLINES, INC., Defendant.**

**No. CV 92–7073 RG (SHX)**

United States District Court, C.D. California.

Aug. 3, 1994.

Kurt Peterson, Marilyn Moberg of Crosby, Heafy, Roach & May, L.A. Maxwell Blecher and Donald Pepperman of Blecher & Collins, Los Angeles, CA, for plaintiff.

William C. Price, Dominic Suprenant of Quinn Emanuel Urquhart & Oliver, Los Angeles, CA, for defendant.

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

GADBOIS, District Judge.

### I. *Background*

In the mid–1980's, Northwest Airlines, Inc. ("Northwest"), retained the law firm of Blecher & Collins, P.C. ("B & C"), to represent it and several other airlines in an antitrust case against American Airlines ("American") and United Air Lines ("United"). Northwest's case did not take off as well as it had hoped, and the relationship between Northwest and B & C disintegrated. B & C now sues for fees. Northwest counterclaims for breach of contract, breach of fiduciary duty, and professional negligence.[1]

### A. *United and American Control the Industry's Two Largest Computer Reservation Systems.*

American and United own and operate SABRE and Apollo, the largest and second largest computerized reservation systems ("CRS"), through which travel agents receive flight information, book flights and print tickets. United and American charge travel agents for using the CRS and also charge the other airlines for displaying their flight information on the CRS screens. Initially, both American and United "biased" their systems, displaying their flight information more prominently than that of other airlines. *In re Air Passenger Comp. Res. Sys. Antitrust Lit.*, 694 F.Supp. 1443, 1450 (C.D.Cal.1988), *aff'd sub nom., Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, (9th Cir. 1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1603, 118 L.Ed.2d 316 (1992) (hereinafter "*CRS*").

In the late seventies, both American and United began offering other airlines "cohost" status for a fee. American and United then biased the CRS in favor of themselves and the co-hosts. *Id.,* 694 F.Supp. at 1450. Northwest accepted this offer and became a co-host on both SABRE and Apollo. Rasenberger Depo. 223:17–224:12; 423:2–25. However, even after becoming a co-host, Northwest, like many other airlines, continued to feel that American and United were "eat[ing it] alive." Abbott Depo. 23:17–20.

In 1984, the Civil Aeronautics Board ("CAB") intervened, ordering CRS owners to provide an unbiased primary display, to charge all carriers the same booking fees, and to make CRS data available for sale. *CRS,* 694 F.Supp. at 1450. However, since the CAB did not set a ceiling on booking fees, United and American responded by raising them.

### B. *The Airlines Agree to Sue as a Group.*

In 1984, representatives of eleven airlines,[2] including Northwest General Counsel James A. Abbott, gathered to discuss suing American and United for antitrust violations. Rasenberger Depo. 33:14–34:2; Abbott Depo. 14:11–21; 22:22–23:1. The representatives recognized their common interest in combating high booking fees and realized that suing as a group would allow them to take advantage of the economies of scale involved in a multi-party suit. Rasenberger Depo. 30:6–31:2; Abbott Depo. 28:7–29:6. Abbott also felt that a multi-party suit would also help demonstrate the "magnitude of the problem" to a court or jury. Abbott Depo. 28:7–29:6.

Therefore, on November 5, 1984, the airline plaintiffs executed a Plaintiffs' Agreement, attempting to identify potential conflicts in the multi-party litigation and "iron[ ] them out." Abbott Depo. 42:4–42:20. They then formed a "Steering Committee," comprised of airline attorneys, to coordinate the litigation. The Steering Committee served

---

1. The following background remarks are not findings of fact, but are merely meant as a roadmap through the testimony and evidence thus far presented.

2. These included Northwest, USAir, Pan American, Republic, Ozark, Midway, Western, AirCal, Muse Air, Alaska Airlines, and Pacific Southwest Airlines.

as a multiheaded client, "responsible for undertaking decisions on behalf of all plaintiffs concerning litigation strategy and case management in pursuit of the common purpose." Plaintiffs' Agreement ¶ 11(b). Decisions other than settlement required only a majority vote of the Steering Committee. Plaintiffs' Agreement ¶ 11(a).

For the most part, the Steering Committee acted like any "good corporate general counsel ... involved [and] active," Rasenberger Depo. 161:9–162:3, but they were not experts in antitrust or complex litigation. Abbott Depo. 143:2–6; Rasenberger Depo. 800:21–23; Sinick Depo. 48:17–49:3. The airline plaintiffs therefore decided to hire "common counsel" to sue United and American. They agreed that the common counsel would represent only those claims which would advance the airline plaintiffs' common purpose.[3] Individual carriers would have to pursue any individual claims on their own.[4]

The airline plaintiffs assumed that damages resulting from American and United's display bias would be a "principal part of the case" and would be pursued by common counsel. Blecher Depo. I 31:9–32:6; Abbott Decl. ¶ 4; Rasenberger Decl. ¶ 8. At the time, Northwest executives realized that each plaintiff might have different damages, but did not believe this would create conflicts of interest. Abbott Depo. 113:13–116:16; Wheeler Depo. 121:19–25; 151:1–17; Rasenberger Depo. 423:2–425:9; 426:16–25.

C. *The Airlines Hire B & C as Common Counsel.*

In November 1984, the airline plaintiffs retained B & C as common counsel. Ray-

mond Rasenberger, outside counsel for Republic Airlines (which later merged with Northwest), served as Steering Committee chairperson and occasional conduit between B & C and the Steering Committee. Rasenberger Depo. 89:25–91:14; 89:25–91:14; 153:10–154:6; 98:12–99:6. Under the B & C Fee Agreement, B & C promised to "work under the direction of the [airline] plaintiffs' Steering Committee." Fee Agreement ¶ 3. B & C maintains that the Steering Committee exerted active control over all aspects of the case, selecting experts, deciding which causes of action and theories to pursue, and helping draft briefs. According to one witness, the Steering Committee was in direct contact with the clients and Blecher "would have abided by [the Steering Committee's] wishes even if he had preferred to go off in another direction." Sinick Depo. 49:10–50:4. Other Northwest representatives, however, maintain that the Steering Committee usually deferred to Blecher, who "was in control of the case, how it was to be tried, what was going to be presented. He was the expert, and he was in charge. That's why we hired him." Wheeler Depo. 39:8–17; *see also* 98:14–17 ("Max was sort of the final arbiter ... he was running the case, but we tried to work together with him."); 110:17–23; 38:21–39:7; Abbott Depo. 88:15–89:10; Thornton Depo. 166:2–20.

Under the Fee Agreement, B & C promised to bill at two-thirds of its regular hourly rate. In return, the airlines promised to pay additional fees if they settled the litigation favorably or abandoned it. Blecher Depo. II 70:5–71:2.[5]

---

**3.** "It is understood, however, that common counsel is under no obligation to prove a particular claim on behalf of any individual plaintiff which in his opinion and that of the Steering Committee ... will not advance the common purpose." Plaintiffs' Agreement ¶ 1(b).

**4.** "To the extent such claims are not, in the judgment of the particular plaintiff, adequately advanced through the process of advancing the common purpose, they may be separately advanced by the respective plaintiff at their own expense and by counsel other than common counsel, it being understood that common counsel will not undertake to represent any plaintiff or other air carrier individually in a claim for

CRS and related damages." Plaintiffs' Agreement ¶ 1(b).

**5.** Specifically, Paragraph 4(d) of the Fee Agreement provided:

If the litigation produces a settlement favorable to plaintiffs in terms of payment of money damages, or a business accommodation ... the plaintiffs will pay the law firm a bonus related to the value of the settlement over and above the legal fees paid at the two-third's rate. The law firm covenants that it will not seek an unreasonable or arbitrary bonus. In all events, such bonus shall not exceed a $5 million maximum which would be paid in the event of a very favorable settlement and would

**D.** *B & C Sues on Behalf of the 11 Airlines; Continental Files a Separate Suit.*

On November 20, 1984, the airline plaintiffs filed suit, alleging that American and United violated Sherman Act section 2. Less than a year later, Continental Airlines, Inc. ("Continental") and two affiliates, represented by separate counsel, filed a similar suit in the Northern District of California. The two cases were consolidated for discovery before Judge Rafeedie.

**E.** *Unlike Continental, the Airline Plaintiffs Decide Not to Pursue Bias Damages Against American and United.*

As noted above, both American and United "biased" their CRS to display their own flights more prominently than those of other airlines. The airline plaintiffs sought bias damages from the outset, Abbott Decl. ¶ 4; Rasenberger Decl. ¶ 8, but were uncertain how to quantify them.

In its separate action, Continental used a simple regression analysis. Frank Decl. ¶¶ 15–18. According to a March 19, 1987 letter from Rasenberger to Blecher, Continental found this approach exciting, and hoped to pursue it alone:

> [Continental has] no interest in our case being linked with theirs for trial and would be happy for a separation. They continue to think that bias damages are the sexiest and potentially most productive part of their case. [They] are aware of your [Blecher's] views on bias damages. If [they] thought we were going to downplay bias damages, I am sure he would be especially anxious for a separation.

Exh. 231.

Blecher and one of the airline plaintiffs' economic experts, Peter Frank, met with Continental's economic expert to discuss how Continental intended to present bias dam-

ages. Frank Decl. ¶¶ 15–18; Blecher Depo. I 84:12–85:19. Frank found Continental's approach too simplistic, and refused to sponsor such a study. Frank ¶¶ 17–18. Blecher was "not impressed" with Continental's work either, but recognized that "many flawed studies get into evidence on the theory that the flaw goes to the weight and not the admissibility." Blecher Depo. I 84:25; 85:13–15.

Frank continued trying to develop an independent theory of bias damages, but a variety of factors, such as mergers, route structures, and co-host status, hampered his efforts. Frank Decl. ¶ 12. According to Frank, these difficulties would have plagued his efforts even if the airlines had sued individually, rather than as a group. Frank Decl. ¶ 21. Blecher found the co-host status of some of the airline plaintiffs (including Northwest) particularly troubling, believing that some might actually have been "net benefactors [from bias]." Blecher Depo. I 55:24–56:2.

By early January 1986, the experts had generated a huge fee, but no bias damage formula. Blecher suggested abandoning the bias damage theory altogether, but the Steering Committee balked. Rasenberger Depo. 376:19–377:13; Exhs. 180, 181. In December 1986, after further bias damage research, Blecher Depo. I 65:6–66:10; Exh. 23, Blecher wrote the Steering Committee, explaining that an overall formula for bias damages was impractical, as each plaintiff would have different bias damages:

> ... it is clear that we cannot use a group approach to conceal the problems of the individuals. Damages must be computed and submitted on an individualized basis. We must approach the problem a though each client's claim is separate, and in fact, it is. ... [The experts will probably ultimately conclude that] some plaintiffs have

---

be scaled down as the result achieved may be less favorable. It is understood that a very favorable settlement would include a component for money damages, as well as relief in the future against excessive CRS charges and/or other abuses of monopoly power. In the event the parties cannot agree on the amount of the bonus, the issue will be referred to final and binding arbitration....
Fee Agreement ¶ 4(d).

And if the airline plaintiffs voluntarily abandoned and dismissed its claims against one or both of the defendants, B & C would be entitled to its full hourly rate.
> In the event plaintiffs voluntarily abandon the litigation, they will pay the law firm an amount which covers its full hourly rates (rather than two-thirds) up to that time.
*Id.* ¶ 4(e).

no display bias claim against AA [American] or UA [United], or conceivably at all. But the state of the law is that we must offset losses to AA ... by gains because of co-host versus non co-host status, and it is probable that some plaintiffs got more benefit out of display bias than they lost because of timing, route structure, etc. For these reasons, we do not believe a single, simple overall formula approach to display bias damages is possible.

Exh. 23. Faced with this recommendation, as well as Blecher's assertions that bias damages could not be calculated even for a *single* airline, the airline plaintiffs abandoned the bias damage theory in the spring of 1987. Northwest implies that the decision was Blecher's, but concedes that "[t]he Steering Committee had to concur in that, and they did concur in that." Rasenberger Depo. 271:8–9;[6] Exh. 192. Moreover, the Steering Committee members "all attempted to obtain whatever information we could as to what the costs and benefits were of shifting our approach on damages from bias to booking fees," Rasenberger Depo. 429:21–430:9, and Rasenberger did his best to keep Northwest apprised of the progress of the damage studies. Rasenberger Depo. 691:25–692:10. Rasenberger wrote Blecher at this time, expressing concern about "the amount of bias damages that, theoretically at least, we might be 'leaving on the table' if we focused our damage claim on booking fees alone." Exh. 29. Blecher assuaged Rasenberger's fears, making the decision to abandon bias damages palatable: "Mr. Blecher suggested that a claim for booking fees could accomplish substantially the same result." Rasenberger Depo. 273:1–3.

**6.** "We had a recommendation that we do that and so I don't know whether you call that making a decision or not. I think it was a decision that Max [Blecher] himself had concluded made sense and which after it was described to us, the committee agreed with." Rasenberger Depo. 271:9–14.

**7.** According to Thornton, Blecher "asked me not to deal directly with the companies to try and settle the case. He didn't think I would be able to get a good settlement without his help and said I didn't know enough about the case to be able to settle it right and thought we would do better by trying it." Thornton Depo. 89:21–90:2.

Under Blecher's direction, the experts studied damages resulting from excessive booking fees from the date of the CAB order, November 14, 1984, forward. Exh. 27.

### F. *Northwest Settles With United.*

Shortly thereafter, Timothy R. Thornton took over as Northwest general counsel. Northwest was experiencing turbulence, brought about in part by an ongoing takeover attempt. Thornton Depo. 68:18–69:17; 91:14–93:21. Despite Blecher's efforts to dissuade him,[7] Thornton settled with United on Oct 5, 1989 for approximately $13,250,000. Exh. 35. Thornton says that he dismissed the experts' estimates as "fantasyland" and went with his instincts, settling the case for "the most I thought I could get." Thornton Depo. 52:15:22. The settlement, he states, was "[e]xclusively my deal." Thornton Depo. 42:11. Blecher agrees: "I had nothing to do with it. ... They never asked my opinion about it one way or the other. I was informed when it was fait accompli." Blecher Depo. I 103:12–17.

### G. *B & C requests a Bonus for the United Settlement.*

After learning of Northwest's settlement, Blecher wrote Rasenberger twice, requesting a bonus pursuant to the Fee Agreement. Exh. 64; Exh. 74. On May 10, 1990, Blecher wrote directly to Thornton, asking for a copy of the settlement agreement. Exh. 68. Thornton was not pleased to hear of Blecher's request: "He can go shit in his hat." Thornton Depo. 152:15–16.[8] The parties disagree as to whether Thornton conveyed this message (or a more polite version of it) to Blecher.

**8.** Thornton felt he had sent Blecher a consistent message:

> Max, if you hit the home run, I'll take care of you, but what you get is a function of what you deliver.... But if he had any vision or expectation that if he got blanked that he was going to get a bonus from me, then he's smoking something, because I'm pretty straightforward, and I made it pretty clear what my position was. I thought I paid too much already.

Thornton Depo. 162:21–23; 163:17–22.

On June 14, 1990, after Thornton left Northwest, Blecher wrote Richard B. Hirst, Northwest's new general counsel, and asked why B & C was not entitled to a fee. Exh. 36. At approximately the same time, B & C also requested a bonus from USAir, which had settled with both American and United. USAir refused to pay B & C, arguing that because the Fee Agreement's bonus provision referred to settlements by "plaintiffs", B & C was entitled to a bonus only if *all* plaintiffs settled. Exh. 508. According to Blecher, Hirst told him that USAir's position was "ridiculous, or some word to that effect." Blecher Depo. II 85:1–14.

Blecher also discussed a bonus with Northwest's assistant general counsel Richard Anderson, who asked Blecher to propose a dollar figure. Blecher Depo. II 127:15–128:13. After Blecher suggested 10% of the settlement, Exh. 92, Hirst wrote a letter to Blecher, stating that

> I agree with you that Northwest's settlement with United Airlines is covered by paragraph 4(d) or 4(e) of the Agreement.... We think the time to consider the fee to which your firm is entitled will be at the conclusion of the case against American, when we will be able to examine the overall results for Northwest in relation to fees paid.

Exh. 37. Although Blecher found this letter encouraging, Hirst later explained that he did not intend to concede that a bonus was due, but meant only to "get [Blecher] off my back until the case was over." Hirst Depo. 77:18–84:25.

### H. *Continental Settles with American and United.*

In the meantime, Continental settled with American for over $100 million. Continental and United went to trial, but the case settled for over $77.5 million after the judge admitted Continental's bias damage study into evidence.

### I. *Northwest Goes to Trial, Loses, and Refuses to Pay B & C a Bonus.*

In the fall of 1989, Northwest went to trial against American. Co-plaintiffs Alaska Airlines, Midway Airlines, and Muse Air pro-

ceeded against United. Judge Rafeedie had already granted summary judgment in favor of United and American on the monopoly leveraging claims, precluding the airline plaintiffs from proving anticompetitive effects in the downstream air transportation market. *CRS*, 694 F.Supp. at 1443. Although Northwest "wasn't very happy with the situation," it tried the case against American anyway. Thornton Depo. 146:1–147:9. "I guess [we] didn't have a choice." Thornton Depo. 146:19–25. Plaintiffs lost both cases on liability; therefore, the jury never reached the damages issue in their deliberations. Blecher Decl. ¶ 6.

Blecher then wrote Hirst requesting a bonus for the United settlement, again suggesting that 10% would be fair and reasonable. Exh. 90, 91, 92. To B & C's chagrin, Hirst made a rather low counteroffer—nothing. Hirst explained that the agreement did not provide for a bonus when individual plaintiffs settled, but only when *all* of the plaintiffs jointly settled. Exh. 95.

B & C requested that Northwest arbitrate the dispute, but Northwest refused. Blecher Decl. ¶ 8. B & C thereafter filed this suit, and Northwest answered with a general denial.

### J. *Northwest's Counterclaim.*

B & C filed a motion to exclude evidence about Continental's settlements, arguing that Continental's case was stronger on the merits and that its settlements were therefore not relevant to Northwest's recovery. In its papers, B & C also stated:

> Even more important is the fact that Continental through means of statistical studies was able to put forth admissible evidence of its damages created by CRS bias. First, Continental's RICO claim permitted such proof. *Second, such proof was possible, because Continental wisely elected to file a separate suit.*

> By contrast, Northwest made a compact to sue along with ten other airlines. That act made proof of bias damages impossible despite the airlines plaintiffs' experts' ... costly efforts to find a way to avoid a

conflict between the plaintiffs' respective damage claims.

Exh. B at 15. Such language was ill-advised. This Court denied B & C's motion to exclude and Northwest pounced on B & C's apparent admission of conflict, amending its answer to assert counterclaims for breach of contract, breach of fiduciary duty, and professional negligence. Specifically, Northwest alleges that B & C breached its contract by seeking an unreasonable bonus and by failing to alert Northwest of the conflicts between the airline plaintiffs. Northwest also alleges that B & C negligently failed to disclose the conflicts, thereby breaching its fiduciary duty.

### K. At His Deposition, Blecher Tries to Explain His "Admissions" of Conflict.

At his deposition, Blecher attempted to explain his apparent admission of conflict: "It was a mistake on my part to say that the presence of the plaintiffs—the multiple plaintiffs was the reason bias damages could not be presented." Blecher Depo. I 54:25–55:3. A conflict never arose, he maintained, because the experts were never able to develop a method to quantify the bias damages. Blecher Depo. I 52:21–56:12. Moreover, Blecher curiously explained, his comments should be discounted because they were made to a federal court. Blecher Depo. I 56:15–57:2.

Blecher acknowledged that the number of plaintiffs would have caused problems in presenting the bias claims to a jury: "[t]he fact that we had ten plaintiffs in the case affected the jury presentation and credibility of the claim to some extent." Blecher Depo. I 54:7–9. Even if the bias experts had been able to quantify damages,

> it would likely be that there would be a disparity in the array of bias damages among and between the plaintiffs which, from a litigation perspective as a trial lawyer, I thought would seriously undermine the case.... Had we been able to quantify bias damages, I certainly would have been somewhat concerned about the jury impact of going forward with a study which presented wildly disparate claims, which appeared to be based on facts and considerations other than the wrongful

conduct of the defendant, which would, therefore, have invited serious and bitter dispute.

Blecher Depo. I 61:21–25; Blecher Depo. II 67:13–19. These issues did not overly concern Blecher, however. Suing as a group "was a decision the Steering Committee made before they hired me, so I didn't give it a whole lot of attention." Blecher Depo. II 67:20–22.

Both parties now move for summary judgment.

## II. Jurisdiction

This Court has subject matter jurisdiction under 28 U.S.C. § 1332. Plaintiff B & C is a California corporation and defendant Northwest is a Minnesota corporation. The amount in controversy exceeds $50,000.

## III. Analysis

Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." F.R.Civ.Pro. 56(c). Under *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 258, 106 S.Ct. 2505, 2515, 91 L.Ed.2d 202 (1986), "[t]he mere existence of a scintilla of evidence in support of [the non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]."

The parties seek summary judgment on the following issues: (A) What was the scope of B & C's representation? (B) Did either potential or actual conflicts arise between Northwest and the other airline plaintiffs? (C) If any conflicts did arise, did Northwest waive them? (D) If any conflicts arose, what damages, if any, did they cause Northwest? (E) Did either B & C or Northwest breach their contractual obligations?

### A. The Scope of B & C's Representation

■ B & C suggests that pursuit of bias damages was outside the scope of the representation, and that therefore B & C cannot be held responsible for failing to disclose any bias damage conflicts. *See, e.g., Kane, Kane and Kritzer, Inc. v. Altagen*, 107 Cal.App.3d 36, 165 Cal.Rptr. 534, 537 (1980). As B & C notes, the Plaintiffs' Agreement permits common counsel to pursue only *common* claims.

B & C contends that since bias damages could be proven, if at all, only for individual plaintiffs, they were not common claims.[9]

This argument has absolutely no merit; it conflicts not only with the testimony of Northwest executives, but also with Blecher's own testimony. Blecher Depo. I 30:20–32:6. Moreover, as Northwest notes, B & C spent huge sums trying to quantify bias damages. If bias damages were not a common claim, what was B & C doing?[10] No evidence supports B & C's position. Pursuing bias damages *was* a common purpose, and no reasonable trier of fact could conclude otherwise.

### B. *Conflict.*

▮ Central District Local Rule 2.5.1 adopts the California Rules of Professional Conduct "and the decisions of any court applicable thereto." Both parties agree that attorneys are evaluated under the standard of professional conduct in effect at the time of the conduct. *Dudugjian v. State Bar*, 52 Cal.3d 1092, 278 Cal.Rptr. 90, 91 n. 1, 804 P.2d 715, 716 n. 1 (1991). Thus, former California Rule of Professional Conduct Rule 5–102(B) governs this case. Under Rule 5–102(B), "[a] member of the State Bar shall not represent conflicting interests except with the written consent of all parties concerned." This rule applies to both actual and potential conflicts: "Rule 5–102 ... requires that an attorney obtain the *informed written consent* of his clients before undertaking any representation which involves even a potential conflict of interest." *Civil Serv. Comm'n v. Superior Court*, 163 Cal.App.3d 70, 209 Cal.Rptr. 159, 168 (1984) (emphasis added); *Klemm v. Superior Court*, 75 Cal.App.3d 893, 142 Cal.Rptr. 509, 512 (1977) ("[I]f the conflict is merely potential ... then with full disclosure to an informed consent of both

clients there may be dual representation."). *See also In re Aguilez*, 1994 WL 266080 (Cal.Bar Ct.1994); *In re Sklar*, 1993 WL 518336 (Cal.Bar Ct.1993).[11] Moreover,

> [it does not] matter that the intention and motives of the attorney are honest. The rule is designed not alone to prevent the dishonest practitioner from fraudulent conduct, but as well to preclude the honest practitioner from putting himself in a position where he may be required to choose between conflicting duties, or be led to an attempt to reconcile conflicting interests, rather than to enforce to their full extent the rights of the interest which he should alone represent.

*People ex rel. Deukmejian v. Brown*, 29 Cal.3d 150, 172 Cal.Rptr. 478, 482, 624 P.2d 1206, 1210 (1981).

▮ An actual conflict exists "whenever [a] common lawyer's representation of [ ] one [client] is rendered less effective by reason of his representation of the other." *Vivitar Corp. v. Broidy*, 143 Cal.App.3d 878, 192 Cal.Rptr. 281, 283 (1983). *See also Bogard v. Employers Cas. Co.*, 164 Cal.App.3d 602, 210 Cal.Rptr. 578, 583 (1985); *San Diego Navy Fed. Credit Union v. Cumis Ins. Soc.*, 162 Cal.App.3d 358, 208 Cal.Rptr. 494, 498 n. 4 (1984); *Spindle v. Chubb/Pacific Indem. Group*, 89 Cal.App.3d 706, 152 Cal.Rptr. 776, 780–81 (1979); *Aguilez*, 1994 WL 266080; *Sklar*, 1993 WL 518336; *In re Respondent K*, 1993 WL 77190 (Cal.Bar Ct.1993). A potential conflict exists whenever representation of one client might, in the future, become less effective by reason of his representation of the other.

### 1. *Actual Conflict*

Northwest argues that B & C's representation of Northwest was in fact "less effective" because B & C improperly considered

---

**9.** B & C points to the December 17, 1986 letter from Blecher to Rasenberger, but this correspondence does not support B & C's current position—the letter does not state that pursuing bias damages is outside the scope of B & C's representation.

**10.** The Plaintiffs' Agreement itself also implies that the common counsel would pursue bias damages.

**11.** B & C argues that Rule 3–310, modified in September 1992, first expressly prohibited representing potentially conflicting claims, and that before then, former Rule 5–102(B) required neither disclosure nor written waiver of potential conflicts. Pansky Decl. ¶¶ 6–8. B & C's position is anomalous, disheartening, and blatantly incorrect, as *Civil Service Commission, Klemm,* and *In re Sklar* make apparent.

the other plaintiffs' interests when it urged Northwest to abandon its bias damage claim. To determine whether an actual conflict arose, this Court must address two questions: (a) Was bias a separate claim, with separate damages, or were bias damages and booking fees simply two ways of measuring the same thing? (b) If bias damages were truly separate from booking fee damages, did B & C urge rejection of bias damages because it was trying to juggle Northwest's interests with those of the other plaintiffs, or did B & C advocate the decision for another reason?

### (a) *Were Bias Damages Distinct from Booking Fee Damages?*

■ If bias damages are simply another way of measuring booking fee damages, B & C was not "less effective" because it presented equivalent evidence of booking fee damages. If, however, bias damages and booking fee damages measure two separate and distinct injuries, then B & C might have been "less effective" by urging Northwest to abandon a distinct claim.

B & C denies that bias damages were a separate claim, citing Frank's declaration testimony that display bias damages were merely "one possible methodology for calculating damages." Frank Decl. ¶ 11. Thus, B & C suggests, bias damages and booking fee damages were two methods for calculating the same thing.

Northwest disputes this, arguing that exorbitant booking fees began in November 1984, after the CAB forced American and United to eliminate CRS bias. In other words, Northwest contends that booking fee damages and bias damages address two different injuries, which occurred at distinctly different times. According to Northwest, they are *not* different methods for calculating the same damages as Frank suggests. In support of this position, Northwest cites Neels' Declaration, which states that bias damages were separate and calculable. This Court cannot resolve this issue on summary judgment.

### (b) *B & C's State of Mind*

Assuming that bias damages and booking fee damages represent separate claims, this Court must ask *why* B & C urged Northwest to drop the bias damages claim. Did B & C believe that bias damages could not be calculated, and thus the bias claim was worthless? Did B & C believe that bias was *not* a separate claim, and thus abandoning a bias theory would not cost Northwest a penny? Or did B & C urge rejection of the bias claim because it feared that Northwest's bias claim would conflict with those of the other airline plaintiffs?

B & C maintains that it advised Northwest to drop bias damages both because booking fee damages were an adequate substitute and because bias damages were incalculable. As B & C notes, the airline plaintiffs' economic expert, Frank, maintains that he was unable to calculate bias damages, *even for individual plaintiffs*. If bias damages could not be calculated for individual plaintiffs and the bias claim was worthless, *no actual conflict* arose since the multi-party representation was not "less effective" than it should have been.

■ However, Neels testifies that Northwest's bias damages totalled $21 million per year on SABRE alone. Neels Decl. ¶ 9. Moreover, *Continental did* estimate its bias damages and successfully introduced its estimate at trial. Frank maintains that Continental's approach was "too simplistic," and Blecher says that he was also "not impressed." Is this why Blecher rejected Continental's approach? If Blecher correctly (or incorrectly) rejected the approach as "too simplistic," no ethical violation occurred. Thus, Northwest must show not only that Blecher's advice was unsound, but also that Blecher was attempting to reconcile the divergent interests of his multiple clients. It must do more than second-guess B & C's decision in light of later events. *See, e.g., Woodruff v. Tomlin*, 616 F.2d 924, 930 (6th Cir.1980), *cert. denied*, 449 U.S. 888, 101 S.Ct. 246, 66 L.Ed.2d 114 (1980) (holding attorney not liable for error resulting from "an exercise of professional judgment."); *Kirsch v. Duryea*, 21 Cal.3d 303, 146 Cal. Rptr. 218, 222, 578 P.2d 935, 939 (1978) (remarking that an attorney is not an "insurer of the soundness of his opinions.").

Blecher insists that his rejection of Continental's approach had nothing to do with reconciling the competing interests of the airlines. Northwest suggests, however, that Blecher is being less than candid. Without directly challenging his honesty,[12] Northwest insinuates that Blecher urged rejection of bias damages not because he believed that they were incalculable, but because he feared conflict between the airline plaintiffs' bias damage claims. After all, Northwest notes, Blecher stated that Continental was able to prove bias damages "because Continental wisely elected to file a separate suit." Blecher also implied that the large number of plaintiffs would have hindered an effort to present the bias damages issue to a jury. Blecher Depo. I 61:21–25; Blecher Depo. II 67:13–19. If Blecher's fear of bias damage conflicts led him to advise the airline plaintiffs to abandon a viable claim for bias damages, an actual conflict arose.

However, Blecher later retracted his "admissions." Northwest contends that this Court should disregard the retraction as a mere sham. *Kennedy v. Allied Mut. Ins.*, 952 F.2d 262, 266–67 (9th Cir.1991) (district courts may ignore "sham" retractions made simply to create an issue of fact and avoid summary judgment). According to Northwest, B & C ratified Blecher's admission by failing to correct it immediately. B & C's failure to correct the "erroneous" admission promptly is troubling, but this Court cannot disregard Blecher's retraction. Frank's declaration supports it, as does logic—Blecher had little reason to suspect that Northwest would have bailed out had he disclosed the conflict, so why would he lie and tell the Steering Committee that bias damages were incalculable? After all, Northwest executives not only knew that Continental wanted to try its bias damage claim alone, but also realized that bias damages would vary among plaintiffs.[13] Moreover, the airline plaintiffs had already indicated that they preferred to remain together for economy and convenience. A jury might doubt that, in such circumstances, a lawyer would risk his professional reputation by concealing a conflict from his clients.

Consequently, this Court cannot grant summary judgment on the existence of an actual conflict. Given Blecher's retraction, Frank's declaration, and the improbability that an attorney in these circumstances would conceal a conflict, a reasonable jury might conclude that no actual conflict arose. However, B & C's "admissions" came in a signed memorandum filed in Federal Court. Blecher's delayed retraction notwithstanding, a reasonable jury examining Blecher's admissions, Continental's success, and Neels' testimony might conclude that an actual conflict existed.

B & C nonetheless contends that it is entitled to summary judgment under *Spindle v. Chubb/Pacific Indem. Group*, 152 Cal. Rptr. 776, 89 Cal.App.3d 706 (1979). B & C is mistaken. In *Spindle*, the defendant, Chubb, insured both the plaintiff, Spindle, and another surgeon for malpractice. When a disgruntled patient sued both surgeons, Chubb hired a single law firm to defend both of them. After the patient won, Spindle sued Chubb, contending that Chubb should have hired separate counsel for each surgeon. The court disagreed:

> Conflict of interest between jointly represented clients occurs whenever their common lawyer's representation of the one is rendered less effective by reason of his representation of the other. Nothing like this is alleged in the [complaint]. The difference in the personal exposure of the two insureds resulting from the difference in their maximum coverage, by itself and without more, creates no actual conflict of

**12.** ... Northwest and its counsel share the sense that the Court must have that this is an unpleasant motion in an unfortunate action. Mr. Blecher is well-known to Northwest and its counsel, as well as to this Court, a successful and able practitioner, and beyond his professional merits as a warm and congenial member of the Bar. Northwest and its counsel take no relish in showing that B & C and its name partner Maxwell Blecher involved themselves in a conflict in its representation of multiple parties ...

Northwest motion at 2.

**13.** Yet, they claim, they did not realize that bias damage claims would create conflict until they heard Blecher's admissions. Wheeler Depo. 121:4–25; Rasenberger Depo. 423:2–425:9; Abbott Depo. 113:13–1165:16.

interest between them in the matter of their joint representation.... Similarly, the difference in the potential for liability of the two insureds, standing alone, does not necessarily result in an actual conflict of interest between them so far as their joint defense is concerned.

152 Cal.Rptr. at 780–81.

■ B & C contends that since the *Spindle* court found that the surgeons' difference in potential liability did not create an actual conflict, a difference in potential recovery is not, as a matter of law, an actual conflict. However, the *Spindle* court merely remarked that a difference in potential liability "*standing alone, does not necessarily*" create an actual conflict. *Id.* Since no evidence suggested that Spindle's co-defendant undermined Spindle's case, the court found that no actual conflict had arisen. *Id.* n. 5. Thus, *Spindle* merely states that where counsel represents co-parties with different potential liability, the party complaining of conflict must *demonstrate*—not assume—that common counsel was "less effective" than he should have been. Because Northwest does not make any such assumption, *Spindle* does not apply. If, as Northwest alleges, B & C persuaded Northwest to abandon a viable claim merely to promote the interests of the other airlines, B & C's representation was clearly less effective than it should have been.

B & C also relies on *Kirsch*, 21 Cal.3d 303, 146 Cal.Rptr. at 222, 578 P.2d at 939, contending that it was free to make judgment calls concerning the effective presentation of evidence at trial. Blecher explains how *Kirsch* supposedly applied to *CRS*:

Q: Was Continental in any different position from the airline plaintiff group that you represented by virtue of the fact that it did not have to harmonize its claim with respect to 10 or 11 other plaintiff carriers?

A: Was it in a different position? Of course it was in a different position. Didn't have to concern itself with presenting the claims of up to 11 plaintiffs to the same jury at the same time. The practical courtroom effect of presenting 10 claims which might have been wildly disparate is entirely different than a single plaintiff, even though it may face the same quantification difficulties presenting its claim.

*That was not an ethical consideration. It's a trial lawyer's litigation decision.*

Blecher I Depo. 63:3–21 (emphasis added).

Blecher is incorrect. A lawyer *is* allowed to make tactical decisions when representing a *single* client, so long as the attorney zealously advocates for that client. However, a decision which compromises an individual client's interest in order to benefit other clients, particularly one which involves dismissing an entire independent claim, or, as Rasenberger puts it, "walking away from money," involves more than tactics. Under Rule 5–102(B), an attorney cannot undertake to balance multiple clients' competing interests without obtaining their informed consent. Thus, B & C "had an obligation to maximize the recovery for *each* client or to obtain the client's written consent." *In re Respondent K*, 1993 WL 77190 at *14, (emphasis added).

This Court denies both parties' motions for summary judgment on the existence of an actual conflict. Whether or not an actual conflict existed is a triable issue of fact.

### 2. *Potential Conflict*

■ Even if an actual conflict did not arise, the multiple representation was fraught with potential conflict. Blecher himself virtually concedes that *if* the economic experts could have quantified bias damages, B & C's representation would have been rendered less effective by the presence of multiple plaintiffs. Blecher Depo. I 61:21–25; Blecher Depo. II 67:13–19. Moreover, one can fathom a myriad of other potential conflicts between eleven competing airlines. B & C fails to present *any* evidence that at the time the airlines retained it, their interests were so perfectly aligned that no potential conflicts existed. Therefore, this Court concludes that the representation involved *potential* conflicts as a matter of law.

## C. Waiver of Conflicts

B & C argues that Northwest waived any conflicts impliedly (by failing to object) and expressly in the Plaintiffs' Agreement and certain correspondence. "The attorney who claims his client consented to a conflicting representation bears a heavy burden of demonstrating that all relevant facts relating to the conflict were disclosed and explained to the client." *Civil Serv. Comm'n v. Superior Court,* 163 Cal.App.3d 70, 84, 209 Cal.Rptr. 159, 168 (1984). Although B & C has demonstrated that Northwest waived objections to potential conflicts, it has not shown that Northwest waived the alleged actual conflict.

### 1. Implied Waiver

■ B & C first argues that the airlines implicitly waived any objection to any conflicts by failing to object to them. B & C contends that under *Health Maintenance Network v. Blue Cross,* 202 Cal.App.3d 1043, 249 Cal.Rptr. 220, 234 (1988) and *In re Lee G.,* 1 Cal.App. 4th 17, 1 Cal.Rptr.2d 375, 385 (1991), a client may implicitly waive his right to object to conflicted representation by failing to object to the representation once he is aware of the conflict.

B & C is incorrect. Both of these cases held that an attorney's *former client* can impliedly consent to his former attorney's decision to represent his current adversary. Neither case holds or suggests that *current* clients can impliedly consent to conflicted representation.[14] Rule 5–102(B) clearly requires attorneys to obtain an informed *writ-ten* waiver of conflicts before embarking on joint representation. Because obtaining a written waiver requires little effort, informs and protects clients, and avoids costly evidentiary and credibility disputes, the rule is inflexible. For example, the California Supreme Court upheld disciplinary action against an attorney who failed to obtain a *written* waiver under Rule 5–102(B), even though the attorney claimed to have obtained informed oral consent to the joint representation. *Gendron v. State Bar,* 35 Cal.3d 409, 197 Cal.Rptr. 590, 597, 673 P.2d 260, 267 (1983). *See also Asbestos Claims Facility v. Berry & Berry,* 219 Cal.App.3d 9, 267 Cal. Rptr. 896, 905–07 (1990); *Civil Serv. Comm'n,* 163 Cal.App.3d 70, 209 Cal.Rptr. at 168; *In re Aguilez,* 1994 WL 266080; *In re Sklar,* 1993 WL 518336; *In re Respondent K,* 1993 WL 77190. *Cf. People v. Chacon,* 69 Cal.2d 765, 73 Cal.Rptr. 10, 16, 447 P.2d 106, 112 (1968) (noting that a defendant's silence does not imply a waiver to a conflict stemming from joint representation).[15] Northwest cannot, as a matter of law, have implicitly consented to any conflict.

### 2. Express Waiver: The Plaintiffs' Agreement

■ B & C argues that under *Elliott v. McFarland Unified Sch. Dist.,* 165 Cal. App.3d 562, 211 Cal.Rptr. 802, 805 (1985), the Plaintiffs' Agreement constitutes written consent to both potential and actual conflicts. In *Elliott,* several school districts, including the Kern High School District and the

---

14. The need to protect clients justifies applying different standards to conflicts between current clients and conflicts between former and current clients. By not allowing implied waivers of a conflict between co-parties, the law places all of the burden of disclosure and consent on the attorney, where it belongs.

However, if the law did *not* allow for implied waivers of a conflict between past and current clients, the burden of disclosure and consent would not only be carried by the attorney, but also by the current client. Since the current client may not be aware of the prior representation, allowing implied waivers of current/past client conflicts protects him. The burden of consent and disclosure falls on the attorney and the former client, both of whom are aware of the prior representation.

15. Although B & C does not so argue, one might contend that while criminal defendants cannot impliedly waive conflicts regarding joint representation, civil litigants can. The rule allows for no such hollow distinction, however—no case suggests that Rule 5–102(B) has one meaning in criminal cases and another in civil cases. Every case which this Court has located states that Rule 5–102(B) requires a *written* waiver. Furthermore, the former/current client conflict cases reject any criminal/civil distinction. *Compare People v. Johnson,* 105 Cal.App.3d 884, 164 Cal. Rptr. 746 (1980) (holding that a criminal defendant can impliedly consent to being prosecuted by his former attorney) with *Health Maintenance Network,* 202 Cal.App.3d 1043, 249 Cal.Rptr. at 234 (holding that a civil litigant can implicitly consent to an opponent using his former attorney).

McFarland Unified School District, agreed to allow the County Superintendent of Schools to obtain legal services for all of them, should any legal troubles arise. Their agreement provided that:

> In the event that two or more parties hereto are unable to resolve a legal issue between them or among them without legal proceedings, the party or parties in contraposition to that of legal counsel as set forth herein on the legal issue involved shall secure its/their separate legal counsel at its/their expense and apart from the costs, fees of liabilities for payments as set forth herein.

211 Cal.Rptr. at 805. Two years later, a teacher sued Kern and McFarland. The Superintendent of Schools retained School Legal Services ("SLS") to represent both districts. Kern and McFarland came into conflict, and SLS withdrew as counsel for McFarland, but continued to represent Kern. McFarland then moved to disqualify SLS, arguing that SLS had violated Rule 5–102(B). *Id.* The Court disagreed, concluding that the joint powers agreement "constitutes written consent" to the joint representation, as well as to SLS' continued representation of Kern. *Id.*

B & C incorrectly argues that the *Elliott* court found that the agreement waived *both* potential and actual conflicts. In fact, the *Elliott* districts agreed to joint representation notwithstanding their awareness that conflicts *might* arise; thus, the agreement waived *potential* conflicts. The *Elliott* districts did not, however, consent to joint representation if an actual conflict did in fact arise. To the contrary, the agreement required districts to seek separate counsel if any actual conflict arose. Thus, the *Elliott* agreement did not waive *actual* conflicts.

The Plaintiffs' Agreement similarly waived only potential conflicts. It states that common counsel will pursue only *common* claims, and that the airlines will hire separate counsel to pursue any individual claims should they arise.[16] Thus, like the *Elliott* agreement, the Plaintiffs' Agreement clearly contemplated and waived *potential* conflicts. However, the Plaintiffs' Agreement does not waive *actual* conflict. It does not even *identify* any actual conflicts. Northwest cannot have knowingly waived an unknown conflict.[17] Thus, the Agreement does not relieve common counsel of his duty to warn clients of *actual* conflicts as they arise.[18]

### 3. *Express Waiver by Letter*

 B & C also argues that Northwest expressly waived any objections to the alleged conflict in certain correspondence between Blecher and Rasenberger. *See* Exhs. 16, 22, 23, 27, 193, and 201. However, none of B & C's letters informs Northwest that an actual conflict existed. The letters do not state that "Northwest's bias damages are calculable, but cannot be presented together with those of the other airline plaintiffs." Similarly, none of the Steering Committee's letters or Northwest's letters expressly consent to an actual conflict. The letters do not state: "We understand that Northwest's bias

---

**16.** *See* Plaintiffs' Agreement ¶ 1(b) ("[C]laims ... not, in the judgment of the particular plaintiff, adequately advance[d] through the process of advancing the common purpose ... may be separately advanced by the respective plaintiff at their own expense and by counsel other than common counsel, it being understood that common counsel will not undertake to represent any plaintiff or other air carrier individually in a claim for CRS and related damages.").

**17.** In essence, the Plaintiffs' Agreement says: "We want common counsel even though we know that some conflicts might arise between us, and we agree to deal with any conflicts as they arise, by retaining separate counsel if necessary." The Plaintiffs' Agreement did *not*, however, say that: "We know that some conflicts might arise, but we don't care what they might be and do not

need to be told when and if any arise." Only the latter statement even purports to waive actual conflicts; however, even this statement does not constitute a *knowing* waiver—how can anyone knowingly waive a conflict without knowing what the conflict is? Thus, this Court cannot construe the Plaintiffs' Agreement as a knowing waiver.

**18.** In fact, since the Plaintiffs' Agreement provides that plaintiffs will seek independent counsel to pursue any independent claims which might arise, the Plaintiffs' Agreement implies that, if any conflicts do arise, individual plaintiffs will have an opportunity to decide whether or not to seek independent counsel and file a separate suit. In order to have such an opportunity, common counsel must inform them of any actual conflicts.

damages are calculable and substantial, and that trying to present all of the bias damage claims together will undermine Northwest's case. Nevertheless, we want to go to trial together anyway, and are willing to give up our bias damage claims to stay together." Without such statements, or their equivalent, the correspondence does not, as a matter of law, waive the alleged actual conflict.

### D. Causation and Damages

■ Even if a jury concludes that an actual conflict arose, Northwest must still prove that it suffered damages as a result of B & C's failure to disclose the conflict. Northwest seeks two types of damages: (1) a refund of the fees it paid B & C and (2) compensation for the disappointing results of its antitrust litigation and relatively low (compared to Continental's) settlement.

#### 1. Fee Refund

■ In California, "[an] attorney's claim for fees may not be allowed if it is established that he or she undertook the representation of conflicting interests without the written consent of both parties." *Asbestos Claims Facility*, 219 Cal.App.3d 9, 267 Cal. Rptr. at 27; *See also Jeffry v. Pounds*, 67 Cal.App.3d 6, 136 Cal.Rptr. 373, 375 (1977); *Goldstein v. Lees*, 46 Cal.App.3d 614, 120 Cal.Rptr. 253 (1975). Thus, if an actual conflict did indeed arise, B & C "risk[ed] disqualification or loss of fees" by continuing to represent the airline plaintiffs without their written consent. *Asbestos Claims Facility*, 219 Cal.App.3d 9, 267 Cal.Rptr. at 28. However, B & C must refund (at most) only the fees it received *after* the actual conflict arose.

#### 2. Damages for Unfavorable Result

■ Northwest also seeks damages to compensate it for its trial loss and disappointing settlement, citing Continental's settlement as a measure of what might have

been. Mere wistful speculation, however, is insufficient. Northwest must *prove* that, had B & C disclosed the alleged conflict, it would have received a more favorable result. *Jackson v. Johnson*, 5 Cal.App. 4th 1350, 7 Cal. Rptr.2d 482 (1992); *Budd v. Nixen*, 6 Cal.3d 195, 98 Cal.Rptr. 849, 852, 491 P.2d 433, 436 (1971); *Campbell v. Magana*, 184 Cal.App.2d 751, 8 Cal.Rptr. 32, 36 (1960).[19] It must present evidence from which a reasonable jury could find that B & C's alleged failure to disclose the alleged conflict *caused* Northwest to (a) lose the American trial and/or (b) obtain a disappointing United settlement. Northwest has not presented such evidence.

#### (a) The American Trial Loss

■ Blecher states that any actual conflict did not affect the American trial because Northwest lost the trial *on liability,* not damages. What does this mean? American allegedly committed two distinct anticompetitive acts, at two different times. First, until 1984, American biased its CRS system in favor of itself and co-hosts. Second, after the 1984 CAB ruling, American allegedly raised its booking fees. Did the jury find that neither act violated the antitrust laws? If so, B & C is entitled to summary judgment on the issue of the American trial loss; B & C's alleged failure to disclose the alleged conflict in calculating bias damages did not cause Northwest to lose the case. If, however, B & C failed to introduce *any* evidence of bias—and not just evidence of bias *damages*—then the jury never knew that American's CRS was biased. Would the jury have found that biasing violates the Sherman Act?

Northwest fails to provide any evidence that B & C failed to tell the jurors that American biased the CRS. In fact, Northwest directs this Court's attention to testimony indicating that the CRS bias issue was presented to the jury. *See CRS Transcript,* Friday, September 29, 1989, 9:00 a.m. at 2–

**19.** Northwest argues that *Haft v. Lone Palm Hotel,* 3 Cal.3d 756, 91 Cal.Rptr. 745, 753–57, 478 P.2d 465, 473–77 (1970) shifts the burden of proof of causation to B & C, since B & C has made proving causation impossible. Northwest is incorrect. *Haft,* which stemmed from an unwitnessed drowning in a hotel pool, protects families of people killed in unwitnessed acci-

dents. No court has ever cited the case as an invitation to disappointed clients to speculate about what might have been. Under Northwest's interpretation, *Haft* would effectively shift the burden of proof of causation and damages to the defendant in *every* legal malpractice action. Neither *Budd* nor *Jackson* gave *Haft* such a broad reading.

252: 5–13 (Opening statement of Bob Cooper, American Counsel). Moreover, Northwest fails to provide *any* evidence that, had B & C emphasized bias more at trial, a jury would have found that American violated the Sherman Act.[20]

Without evidence that B & C convinced Northwest to discard a viable *liability claim,* and not merely a way of measuring damages, a reasonable jury could not· find that the alleged conflict caused Northwest's trial loss.

### (b) *The United Settlement*

 Northwest has similar causation problems with regard to the United settlement. B & C argues that Thornton's solo negotiation of the United settlement broke the chain of causation, and notes that courts are loathe to allow settling plaintiffs to later second-guess themselves by suing their attorneys. *See Schlomer v. Perina,* 169 Wis.2d 247, 485 N.W.2d 399 (1992); *Carlson v. Fredrikson & Byron, P.A.,* 475 N.W.2d 882 (Minn.1991); *Muhammad v. Strassburger, McKenna, Messer, Shilobod and Gutnick,* 526 Pa. 541, 587 A.2d 1346 (1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 196, 116 L.Ed.2d 156 (1991); *Becker v. Julien, Blitz & Schlesinger, P.C.,* 66 A.D.2d 674, 411 N.Y.S.2d 17, *aff'd* 95 Misc.2d 64, 406 N.Y.S.2d 412 (N.Y.Sup.Ct.1977).

Whether B & C is correct depends upon whether Thornton would have acted differently had B & C disclosed the alleged conflict. If B & C had disclosed the alleged conflict, would Thornton have sought more, or declined to settle the case at all? No evidence suggests that, but for the B & C's alleged failure to disclose, Thornton would

---

**20.** Northwest cites *no* testimony, expert or otherwise, suggesting that the trial result would have been different had B & C presented more evidence of bias.

**21.** He notes, however, that he was influenced by both Blecher and Rasenberger:

[M]y feelings about the case were based on what I looked at, which included [Judge] Rafeedie's summary judgment decision; upon my discussions with Schoellhamer; upon my discussions with some of the guys in my office . . .; upon my discussions with Max—my discussions with Rasenberger; my discussions with Lloyd; my discussions with McNamara; my discussions with Hoenicke; and sitting in the courtroom . . .

---

have acted differently. Rather, the record indicates that Thornton believed the case was a bloated, poorly handled, albatross. He decided to settle the case, not because B &.C misled him, but because he wanted to reduce Northwest's legal expenditures:

Q: Do you know who was running this case from Northwest's perspective before you came there?

A: That was one of the problems. Nobody was. Nobody had a handle on it. . . . I took one look at Northwest's budget for outside legal services and said this thing had to be cut, and I did it. For a company that had a reputation of being lean and mean in most areas, their budget for outside legal services was, in my view, excessive.

Thornton Depo. 20:1–11.

Nor does the record suggest that Thornton relied on B & C's damage calculations or failure to calculate bias damages. According to Thornton, the settlement was "[e]xclusively my deal." Thornton Depo. 42:11. No evidence suggests that Thornton came to the bargaining table armed with purportedly false information—that bias damages were incalculable—and, therefore, discounted the value of Northwest's claim. According to Thornton, he dismissed the experts' damage estimates as "fantasyland" and simply went with his instincts, settling the case for "the most I thought I could get." Thornton Depo. 52:15–22.[21] Thornton explained:

Q: [How did the settlement discussions start?]

A: . . . I think he made me an offer.

---

Thornton Depo. 98:12–99:4. What did these people tell him? The Airline Plaintiffs' expert, Frank, continues to insist that display bias damages were merely "one possible methodology for calculating damages," Frank Decl. ¶ 11, and Blecher allegedly told Rasenberger that "a claim for booking fees could accomplish substantially the same result" as one for bias damages. Rasenberger Depo. 273:1–3. If Thornton settled the case based on his instincts and in part on what Blecher and Rasenberger told him, he would not have discounted the claim, since Blecher had told Rasenberger that Northwest was not leaving money on the table by abandoning bias damages.

Q: ... Was there any discussion before you came back with your counteroffer, if you will, about what that figure was based on? Was there any kind of—

A: No.... It was like the way all cases ultimately get settled, what—what [United] will pay and what [Northwest] will take, and damage theories and expert conclusions and stuff like that go by the wayside.

Q: And you didn't take into account any kind of figure that the experts had come up with, with respect to Northwest's damages—

A: No.... I knew I wanted out; if not out of the whole thing [both United and American], at least part of it. And I wanted to get the most money I could to hedge my downside; and if the experts had any downside, we'd see.

 . . . . .

I wanted to get as much as I could, and I didn't want to leave the entire result of this case or what a Los Angeles County jury might do ... I might as well have gone to the lotto.

Thornton Depo. 96:3–98:10. No evidence indicates that Thornton would have held out for more had B & C disclosed the alleged conflict. No evidence indicates that, had B & C disclosed the alleged conflict, Northwest would have obtained separate counsel and pursued the bias claim.

Moreover, no evidence suggests that United would have offered a more favorable settlement had Northwest succeeded in calculating bias damages. Northwest offers no testimony of any United executive who participated in the settlement negotiations suggesting that Northwest could have obtained a more favorable settlement. Thornton, an attorney with twenty years of experience and a top Northwest executive, Thornton Depo. 6:20, still believes that he obtained "the last dollar or close to the last dollar" that United was going to offer. Thornton Depo. 99:14–15. In sum, no evidence suggests that either Thornton or United would have behaved any differently but for B & C's alleged failure to disclose the alleged conflict. No reasonable trier of fact could find that B & C's alleged failure to disclose a conflict caused Northwest to obtain an unfavorable settlement.

### E. Breach of Contract

B & C contends that Northwest breached the fee agreement by failing to pay it a bonus for the United settlement; Northwest counters that B & C breached the fee agreement by asking for the bonus.

█ Absent any extrinsic evidence, contract interpretation is a question of law appropriate for summary judgment. *See, e.g., Market Ins. v. Integrity Ins.,* 188 Cal. App.3d 1095, 233 Cal.Rptr. 751, 752 (1987); *Sayble v. Feinman,* 76 Cal.App.3d 509, 142 Cal.Rptr. 895, 897 (1978). Contracts "must be construed as a whole and the intention of the parties must be ascertained from the ... entire contract, not some isolated portion." *Marin County v. Assessment Appeals Bd.,* 64 Cal.App.3d 319, 134 Cal.Rptr. 349, 352 (1976). Furthermore, courts should attempt to construe contracts to avoid absurdity, and must reject interpretations which would make the contract unusual, extraordinary, harsh, unjust, or inequitable. *See* Cal.Civ. Code §§ 1638, 1643; *Straus v. North Hollywood Hosp., Inc.,* 150 Cal.App.2d 306, 311, 309 P.2d 541 (1957).

### 1. Northwest's Breach of Contract Claim

█ The Fee Agreement prohibited B & C from seeking an "unreasonable" bonus. Northwest contends that B & C breached the Fee Agreement by asking for a bonus of 10% of the United settlement. If an actual conflict arose, Northwest is correct; *any* request for a bonus would be unreasonable. *Asbestos Claims Facility,* 219 Cal.App.3d 9, 267 Cal.Rptr. at 27; *Jeffry,* 67 Cal.App.3d 6, 136 Cal.Rptr. at 375. If, however, no actual conflict existed, a reasonable trier of fact would necessarily conclude that *merely asking* for a bonus of 10% (giving B & C a total of 17%) of the United settlement is not so unreasonable that it constitutes a breach of contract. *See, e.g., Venegas v. Mitchell,* 495 U.S. 82, 110 S.Ct. 1679, 109 L.Ed.2d 74 (1990) (affirming 40% contingency award); *Sweeney v. Athens Regional Medical Ctr.,* 917 F.2d 1560, 1569 (11th Cir.1990) (finding 50% bonus not excessive); *Setzer v. Robin-*

*son,* 57 Cal.2d 213, 18 Cal.Rptr. 524, 527, 368 P.2d 124, 127 (1962) (noting that "[c]ontingent fee contracts for one-third of the recovery have frequently been upheld."). The Fee Agreement explicitly provided that the airlines would pay B & C a bonus in the event of a favorable settlement. In return, B & C promised to charge only ⅔ of its hourly fee. Thus, unless an actual conflict existed, requesting a bonus was not unreasonable as a matter of law.

### 2. *B & C's Breach of Contract Claim*

Assuming no actual conflict existed, B & C will prevail on its breach of contract claim if it can show (a) that the Fee Agreement provides for a bonus if an *individual* plaintiff abandons or settles its case; and (b) that the United settlement was "favorable." B & C has met both of these requirements, and thus, if no actual conflict existed, B & C is entitled to a reasonable bonus as a matter of law.

(a) *The Fee Agreement Provides for Additional Fees When an Individual Plaintiff Abandons or Settles its Claims.*

 As Northwest notes, the Fee Agreement provides for additional fees in the event of a settlement or abandonment of the litigation by "plaintiffs." Fee Agreement 4(d)–(e). Northwest argues that this language means that additional fees are due only if *all* of the plaintiffs settle or abandon their claims.

This Court disagrees. First, contrary to Northwest's assertions, the language itself does not unambiguously require action by *all* plaintiffs. If the contract meant to provide for a bonus only if "each and every plaintiff" settled, it should have said so—it does not. Second, reading the contract as a whole, this Court notes that each individual plaintiff was responsible for its own proportionate fees. Fee Agreement ¶ 6. Similarly, each plaintiff had an independent right to abandon or settle its claims. These facts suggest that each individual plaintiff who abandoned or settled its claims would be responsible for paying additional fees. Third, Northwest's construction is unusual and inequitable. It would deny B & C *any* bonus even if 10 out of 11 plaintiffs reached very favorable settlements—a harsh all or nothing result. Given

that the airline plaintiffs expected to (and did) settle along the way, this Court doubts that either B & C or the plaintiffs intended to make bonuses contingent on all the plaintiffs settling simultaneously.

(b) *Was the United Settlement "Favorable" Within the Meaning of the Fee Agreement?*

 Under the Fee Agreement, B & C could recover additional fees only if the settlement was "favorable." Fee Agreement ¶ 4(d). Northwest argues that a reasonable jury could conclude that the United settlement was not "favorable" because it was less than Northwest initially hoped it would be. This argument strains credulity. Northwest may wish it had recovered more, but it recovered approximately thirteen million dollars and ended up in the black—a "favorable" settlement by *any* sensible definition. If the settlement was less than Northwest had hoped, this should go to the *amount* of B & C's bonus, not whether one is due.

### IV. *Conclusions*

A. Pursuit of bias damages was not outside the scope of B & C's representation.

B. A potential conflict existed; whether or not an actual conflict existed is a triable issue of fact.

C. Northwest waived its objections to *potential,* but not actual, conflicts in the Plaintiffs' Agreement and the Fee Agreement; Northwest did not consent to actual conflicts.

D. Northwest has not shown that B & C's alleged failure to disclose an actual conflict caused it to lose the American trial or to settle for its claims against United for too little; thus, if an actual conflict arose, Northwest can recover (at most) the fees it paid B & C after the actual conflict arose.

E. The Fee Agreement provides for a bonus in the event of settlement by a *single* plaintiff and the United settlement was favorable within the meaning of the Fee Agreement; thus, if no actual conflict existed, B & C did not breach the Fee Agreement by requesting a bo-

nus and is entitled to a reasonable bonus.

 Attorneys must proceed with extreme caution when representing multiple clients. Good intentions and honesty are not enough. A failure to "give [conflicts] a whole lot of attention" can cause even an honest lawyer to run afoul of ethical rules. Blecher Depo. II 67:20–22. Attorneys, used to making tactical decisions unilaterally, often make "tactical" decisions on behalf of multiple clients, compromising the claims of each in order to better the case of the clients as a whole. Yet balancing the different interests of a single client is not the same as balancing different interests of multiple clients. Even if an informed client would have agreed to the compromise, an attorney cannot make such a choice himself without breaching his ethical duties. The client must be the master of his own case.

To ensure that a client controls his own destiny, waivers of conflicts between co-clients must be written. This requirement imposes a trivial burden on counsel, but protects clients and prevents expensive credibility contests.

Applying these rules to the instant case, a jury must determine whether, in fact, Northwest's bias damages could have been calculated, and whether, if so, B & C encouraged Northwest to abandon a bias claim because it was attempting to juggle the interests of Northwest and the other airline plaintiffs. If an actual conflict arose, B & C is not entitled to any bonus, and must reimburse Northwest for fees paid *after* the conflict arose. If a jury determines that no actual conflict arose, B & C is entitled to a reasonable bonus.

IT IS SO ORDERED.