112 Cal.Rptr.2d 426 (2001)
92 Cal.App.4th 730
Michael VINER et al., Plaintiffs and Respondents,
v.
Charles A. SWEET et al., Defendants and Appellants.
No. B138149.
Court of Appeal, Second District, Division Seven.
September 28, 2001.
Review Granted December 19, 2001.
*427 Munger, Tolles & Olson, Dennis C. Brown, Mark B. Helm, Allison B. Stein, Steven W. Hawkins, Los Angeles; Kester & Isenberg and Charles F. Kester, Woodland Hills, for Defendants and Appellants.
Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, Patricia L. Glaser and Peter C. Sheridan, Los Angeles, for Plaintiffs and Respondents.
Certified for Partial Publication.[*]
JOHNSON, J.
In this lawsuit for legal malpractice arising from advice relating to a business transaction, the trial court refused to require proof of a "case within a case" as generally would be required in a malpractice action arising in the context of litigation. Instead the court applied criteria traditionally used in negligence actions to the questions of causation and damages. This meant the plaintiffs in this transactional legal malpractice action were not required to prove the opposing side in the *428 contract negotiations would have given them a better deal than the contract terms affected by their attorney's negligence, had the negligence not occurred. We affirm the trial court's disposition of this issue in the published portion of this opinion. In an unpublished portion of the opinion we find the testimony of respondents' expert admissible and also conclude substantial evidence supports the verdict with the exception of two major categories of damages. Because the evidence was insufficient as to the latter, we reduce the judgment from $13,291,532 to $8,085,732.

FACTS AND PROCEEDINGS BELOW
In this appeal challenging the sufficiency of the evidence to support the judgment in favor of respondents, we review the evidence in the light most favorable to the judgment below.[1]
Plaintiffs and respondents Michael Viner and Deborah Raffin Viner launched Dove Audio, Inc. in 1984. Dove was one of the first companies to issue audio books read by their authors or celebrities. Dove was also involved in television and movie projects, as well as print books.
Dove went public in 1994. In 1995, Dove entered into long-term employment contracts with the Viners, guaranteeing large salaries, bonuses, fringe benefits, and indemnification. The Viners also received a large amount of Dove's common stock as well as all of its preferred cumulative dividend Series "A" stock.
David Povich, a partner in the Washington DC office of defendant and respondent law firm Williams & Connolly ("W & C"), was a long-time friend and attorney of Michael Viner. Viner and Povich discussed the possibility of selling the Viners' interest in Dove so they could concentrate on film and television projects. In the fall of 1996, the Viners received a proposal from Norton Herrick for the purchase of all their interest in Dove. This transaction would also involve ending the Viners' employment with Dove.
Viner had always consulted and relied upon lawyers in legal matters, and upon receiving the Herrick proposal, he asked for legal help from Povich. Povich assigned the transaction to his partner, defendant and appellant Charles A. Sweet, who was a corporate transactional lawyer. Although Dove was a California corporation, the Viners were California residents, and the Herrick agreement was negotiated in California, Sweet was not a member of the California bar and was not familiar with applicable California law. The Viners were not aware of these facts, nor were they aware Sweet had never drafted an employment termination agreement.
The Herrick transaction did not close. However, during the negotiations, Sweet learned of the Viners' employment agreements. He also learned substantial unpaid dividends were due to the Viners on their preferred stock, they desired to sell all of their stock, and they wanted to protect their right to engage in the television and movie business after leaving Dove.
After the Herrick deal fell by the wayside, the Viners were contacted by Ronald Lightstone of Media Equities International ("ME I"). In March 1997, ME I and the Viners executed a stock purchase agreement whereby MEI invested $4 million, and the Viners invested $2 million, to purchase Dove stock.
By early May 1997, "significant differences" had developed between MEI and *429 the Viners. The parties threatened each other with litigation, and ultimately decided to enter into a transaction whereby the Viners would sell much of their stock to ME I and would be paid over time for the cancellation of their employment contracts. A "term sheet" dated May 29, 1997 was prepared, providing Dove would purchase specified shares of the Viners' stock. The Viners would resign from Dove, and Dove would pay the Viners $1.5 million over five years. According to the term sheet, the Viners would "not compete in any way in the audio book business for a period of three years from the date of the agreement," and would "not directly or indirectly contract with any author or, for purposes of audio books, reader, currently, under contract or included in the Company's book or audio catalogues for a period of three years." However, the Viners had not agreed to all the provisions in the term sheet.
The Viners asked Sweet to represent them in finalizing the deal. Sweet negotiated with Lightstone between Monday, June 2, and Thursday, June 5, 1997. Negotiations broke off before the agreement could be approved at a Dove board meeting on June 5. The impasse was broken over the following weekend, and Viner instructed Sweet to get the deal done "as soon as possible." The agreement was finally executed on Tuesday, June 10, 1997.
The agreement most crucial to this litigation is the Employment Termination Agreement, referred to by the parties as the "ETA." The ETA and contemporaneous agreements terminated the Viners' employment with Dove, sold a substantial portion of the Viners' common stock to MEI, and provided for Series E preferred stock to be held in escrow for distribution to the Viners if Dove defaulted on its monthly payment obligations.
Based on Sweet's advice, the Viners believed the ETA provided for monthly payments from Dove for three years, unchanged indemnity protection from Dove, and credit for work done before they left Dove. The Viners also understood under the ETA they could engage in film and television production and other business which did not interfere with Dove's audio book business. They also believed if Dove defaulted on the cash payments, the two non-compete clauses in the ETA would become void. The Viners had told Sweet repeatedly these terms were essential and non-negotiable, and Sweet had been instructed to take whatever time was necessary to obtain them. Sweet assured the Viners each of these goals had been accomplished.
The ETA contained a provision whereby disputes arising out of the agreement would be submitted to binding arbitration. After the ETA was executed, disputes arose between the Viners and Dove.[2] The parties engaged in arbitration proceedings relating to the validity of the ETA's noncompetition clause, the producer credits owed Raffin for work initiated during her tenure at Dove, and the Series E security provision in the ETA.
The Viners filed suit against Sweet and W & C on June 3, 1998, seeking damages for malpractice in connection with the ETA and related agreements. W & C cross-complained for $30,000 in unpaid legal fees. The trial of the action involved seven separate claims of malpractice, as follows:
1. The Non Solicitation Clause. The ETA contained a non-solicitation clause *430 (section 1.10 of the ETA).[3] Viner told Sweet he was concerned section 1.10 might forbid the Viners from soliciting their old contacts to work on television and feature film projects, and Sweet told him not to worry because the clause was limited to the book and audio book businesses. However, the language of section 1.10 was ambiguous and Dove took the position section 1.10 prohibited the Viners from soliciting Dove authors or readers for television or movie projects. The Viners alleged section 1.10 prevented them from doing projects with Dove authors Larry King, Carl Reiner, Andy Rooney, and Stephen King, as well as well-known author Frederick Forsythe.
2. Non Competition Clause. Section 1.8 of the ETA prohibited the Viners from competing in the audio book business for five years.[4] The Viners contended Sweet was negligent in permitting section 1.8 to be included in the ETA, because it was arguably unenforceable under Business and Professions Code section 16600.[5] Although *431 section 1.8 was upheld by an arbitrator, the Viners' standard of care expert testified Sweet was negligent in not having knowledge of Business and Professions Code section 16600.
3. Attorney Fees. The Viners requested an attorney fees provision in the ETA, and believed such a provision was included. However the ETA did not permit the parties to recover attorney fees incurred in arbitrating disputes under the agreement, but only permitted them to recover fees incurred in enforcing an arbitration award.
4. Producer Credit. The Viners originally told Sweet they wanted Raffin to receive "Producer" credit for all audio books initiated during her employment with Dove. They later agreed to compromise and accept instead "Executive Producer" credit, "in accordance with normal practice." However, because Raffin had told Sweet she wanted Producer credit, he struck the word "Executive" from the last draft faxed to the Viners. This change created an ambiguity because it was not Dove's normal practice to give Producer credit to someone who had no hands-on involvement in a project. The Viners did not notice the change, so the final version contained the ambiguous term. Dove ultimately relied on the provision to give no credit to Raffin at all.
5. Series A Stock Dividends. The Viners were owed dividends on Series A Dove stock they owned. However, they lost the right to these dividends because Sweet failed to exclude them from the general release contained in the ETA.
6. Indemnification. The Viners wanted the ETA to contain an indemnity provision which preserved the same level of protection they enjoyed as during their employment with Dove, however, Sweet failed to negotiate such a provision.
7. Series E Security. The Viners claimed they would have been better off with no security for the monthly payments due under the agreement, than with the option to receive Series E stock under the ETA.
W & C moved for summary judgment, and such motion was denied on August 13, 1999. W & C's motion to strike the opinions of the Viners' damages expert, Dr. Barbara Luna, was denied without prejudice, subject to W & C's examining Luna on voir dire at trial "to test the question of the nature of the material on which she relied in forming her opinions." However, W & C did not do so at trial. In the midst of Luna's trial testimony, the trial court read a modified version of BAJI 2.40 (Expert TestimonyQualifications of Expert).[6]
At trial, the jury was permitted to ask questions of each witness by submitting written questions which, after review by counsel, were read by the trial court. W & C's motions for partial nonsuit (relating to the indemnification issue) and directed verdict were denied.
*432 The jury deliberated for five days. During deliberations, the reporter re-read portions of Dr. Luna's testimony, as requested by the jury.
W & C submitted a special verdict form which was given to the jury over the Viners' objections. With respect to each of the seven acts of malpractice alleged by the Viners, the form asked (1) whether W & C was negligent; (2) whether W & C's negligence caused damage to the Viners; (3) whether the Viners had proven damages, and the amount of such damages, if any; (4) whether the Viners were contributorily negligent; and (5) the percentage of the Viners' negligence, if any. The jury awarded damages for malpractice on all seven issues, totaling $13 million, as follows:

 Claimed Special Gross Contrib. Net
 Malpractice Verdict Item Damages Negligence Damages
1. Non-Solicitation D: "The Author-Reader/ $9,901,050 None $9,901,050
 Clause Non-Solicitation Issue"
2. Non-Competition C: "The Audiobook/Non- $2,159,772 None $2,159,772
 Clause Competition Issue"
3. Attorney Fees F: "The Attorneys' Fees $ 462,284 No $ 462,284
 Issue"
4. Producer Credit E: "`Producer Credits' $ 500,000 20% $ 400,000
 Issue"
5. Series A Stock A: "The Unpaid Dividend $ 127,666 None $ 127,666
 Dividends Issue"
6. Indemnification G: "The Indemnification $ 125,000 None $ 125,000
 Issue"
7. Series E Security B: "The Payment Obli- $ 115,760 None $ 115,760
 gation Issue"

In November, 1999, W & C moved for a new trial and JNOV. As they do on appeal, W & C argued the jury should have been instructed to find "but for" causation, and in particular the Viners should have been required to prove they would have obtained a better deal but for Sweet's negligence. W & C also challenged Dr. Luna's qualifications and opinions. The trial court denied both motions on December 27,1999. W & C timely appealed.

DISCUSSION

I. THE VINERS WERE NOT REQUIRED TO PROVE THEY COULD HAVE OBTAINED A "BETTER DEAL" BUT FOR APPELLANTS' NEGLIGENCE.

A. The Case Within a Case Requirement is Not Appropriate in This Transactional Malpractice Action.

Appellants contend respondents were required to, but did not, prove Dove would have given them a "better deal" than it did, but for appellants' negligence.[7] Because it is undisputed respondents did not attempt to prove Dove would have done so on the specific contract terms at issue in this action, appellants contend reversal is required. Respondents, on the other hand, contend they were not, on the facts of this case, required to prove absent W & C's negligence, they would have been able *433 to obtain a more favorable deal with Dove. Based on the facts before us, we agree with respondents and hold respondents adequately established causation at trial.
Some 30 years ago, in Budd v. Nixen,[8] the California Supreme Court set forth the elements of a cause of action for professional negligence: "(1) the duty of the professional to use such skill, prudence, and diligence as other members of [the] profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence. [Citations.] [¶] If the allegedly negligent conduct does not cause damage, it generates no cause of action in tort. [Citation.] The mere breach of a professional duty, causing only nominal damages, speculative harm, or the threat of future harmnot yet realized does not suffice to create a cause of action for negligence. [Citations.]"[9]
In the litigation context, "`[a] client claiming that his [or her] attorney was negligent in connection with litigation has the burden of proving that damages resulted, this burden involving, usually, the difficult task of demonstrating that, but for the negligence complained of, the client would have been successful in the prosecution or defense of the action in question.' [Citation.] `Thus the issue of liability includes not only a showing the attorney was negligent but also a showing his [or her] negligence caused damage.' [Citation.] Essentially, [plaintiff] had the obligation to `retry' the [underlying] action during the malpractice trial." [10]
Appellants contend the same approach should apply in cases of transactional malpractice such as this one, but argue "instead of proving the outcome of a trial, the plaintiff alleging transactional malpractice must prove the outcome of a negotiation." Thus, say appellants, the transactional legal malpractice plaintiff must prove one of two things would have occurred in the absence of the attorney's negligence: either (1) the client would have obtained a different deal which was more advantageous to the plaintiff, or (2) the client would not have entered into the deal at all, and would thereby have been better off. We disagree. While the case within a case method is appropriate in a litigation malpractice action, it is not appropriate for cases of transactional malpractice such as the one before us. The "negotiation within a trial" approach urged by appellants is akin to requiring the plaintiff in a breach of contract action to prove not only the defendant's breach of a contract term but that someone else would have agreed to and properly performed that termin order to show the defendant's breach actually caused the plaintiffs damages.

*434 1. California Courts Have Recognized the Need for a More Flexible Causation Analysis in Non Litigation Malpractice Cases.

In California State Automobile Association Inter Insurance Bureau v. Parichan, Renberg, Crossman & Harvey,[11] the Court of Appeal held the case within a case methodology, in which the plaintiff is required to prove the outcome of the underlying litigation or negotiation, is not appropriate for all cases involving legal malpractice.[12] In CSAA, an insurance company brought a legal malpractice action against the law firm it hired to represent its insured in a personal injury case arising from an automobile accident. The claimed negligence did not involve the firm's defense of the underlying case, but comprised the firm's failing to forward a doctor's report to the insurance company after receiving a $50,000 policy-limits settlement demand. The report showed the plaintiff had substantial injuries, but because the insurance company did not have the report, on counsel's advice the company rejected the policy-limits demand.[13] The company later determined it had a substantial risk of a substantial bad faith award against it, and settled the underlying suit for $850,000.[14] It sued the attorneys to recover the difference between the amount of the original policy-limits demand, and the amount ultimately paid in settlement.[15]
The jury in CSAA was given a special verdict form similar to the one given the jury in this case. It asked the jury "(1) whether [attorney] Parichan was negligent in failing to promptly advise CSAA of the [doctor's] report and whether such negligence caused CSAA's damages; (2) whether Parichan was negligent in any other respect; (3) whether Parichan's negligence in any other respect caused CSAA's damages; and (4) what the jury found to be the total amount of damages caused by Parichan's negligence."[16] The jury answered "yes" to the first question and awarded damages of almost a million dollars. The law firm appealed, arguing the trial court erred in refusing to direct the jury to determine the outcome of both the underlying personal injury case, and any subsequent bad faith case against CSAA.[17]
The Court of Appeal affirmed the judgment. It first explained the reason for the case within a case methodology: "Our review of the abundant precedent in the legal malpractice arena indicates that the case-within-a-case methodology is not universally used to determination [sic ] causation and damages. Although no bright line rule tells us when this methodology must be used, it is quite clear that, when the malpractice involves negligence in the prosecution or defense of a legal claim, the case within a case method is appropriately employed. (Mattco Forge, Inc. v. Arthur Young & Co. (1997) 52 Cal.App.4th 820, 832-834, 60 Cal.Rptr.2d 780 (Mattco Forge) [discussing method of proof when an attorney's negligence results in loss of client's legal claim or defense].) Thus, *435 when a client seeks to recover damages for his [or her] attorney's negligence in the prosecution or defense of the client's claim, the client must prove that `but for that negligence a better result could have been obtained in the underlying action. [Citation.] "An attorney malpractice action then, involves a suit within a suit, a reconsideration of the previous legal claim, and only by determining whether or not the original claim was good can proximate damages be determined." [Citation.] This trial within a trial avoids the specter that the damages claimed by a plaintiff are a matter of pure speculation and conjecture.' [Citations.]"[18]
The court in CSAA went on to explain "However, in other contexts, most often involving business transactions, causation and damages may be more simply established under rules applicable to all negligence claims and the case-within-a-case procedure is not utilized. As a general rule, `[a]n attorney's liability in a malpractice action, as in other negligence cases, is for all damages directly and proximately caused by his [or her] negligence. [Citation.]' One commentator describes the difference between the proof of causation and damages in the `litigation' and `transactional' malpractice contexts in this way: `When the legal malpractice takes place in a transactional settingthat is, in the advising and planning of business dealingsthe courts take a much less structured approach to proof of damages. No longer wedded to a narrow interpretation of what can constitute adequate proof of the fact and amount of injury, the courts tend to treat such actions like ordinary business cases and allow considerably more flexibility to plaintiffs in proving their damages.' (Bauman, Damages for Legal Malpractice: An Appraisal of the Crumbling Dike and the Threatening Flood (1988) 61 Temp. L.Rev. 1127, 1150.)"[19] Therefore, the court in CSAA affirmed the judgment for the plaintiff.
We agree with the CSAA court's conclusion transactional malpractice cases call for a "less structured approach to proof of causation and damages."[20] The case within a case approach has limited utility in such cases. While the case within a case method is an efficient and wellestablished way of determining damages where an attorney has been negligent in the conduct of litigation, it should be limited to that context. In litigation malpractice, the parties and the court are faced with a zero-sum game: either the plaintiff would have won the underlying litigation but for the attorney's malpractice (or would at least have suffered a smaller loss), or he would have lost at trial anyway. It is therefore a relatively simple matter (conceptually if not practically) to go back and re-construct the underlying litigation absent the attorney's negligence, in order to see if the result was indeed caused by such negligence. The very jury hearing the malpractice case can hear the evidence the plaintiff would have used in the underlying litigation and objectively decide whether the plaintiffs case would have been successful.
A business deal, by contrast, is not a zero-sum game with a clear winner and a clear loser. The terms of the contract are interdependent, with much give-and-take and trading between the parties. If one party gives on one contract term the other *436 party may well give on another. Thus, it is difficult if not impossible to conclude a party could not have obtained a "better deal" from the other party as to any given contract term or terms. Moreover, while parties to litigation are generally committed to the process until the case is either settled or comes to judgment, each party to a business transaction generally remains free to walk away at any time and often can seek a better deal elsewhere if not satisfied with the terms the other side is offering.
Reconstructing the accident or other historical event which gave rise to the underlying case within a case in a litigation context is a rather straightforward enterprise. It relies on objective evidence of what witnesses saw or heard or said on that occasion. On the other hand, determining whether a party would have been willing to give a better deal on a given contract term or terms during a past negotiation is a highly speculative venture. This is especially true since, as here, appellants' evidence will typically consist not of testimony the plaintiff asked the opposing party for the disputed contract terms during the negotiations, and was turned down. Rather appellants' requested inquiryand the evidence they tenderedinvolve subjective testimony about hypothetical scenarios, and principally from those who represented the party on the other side of the contract negotiations. As here, this is the very party the plaintiff typically will have been forced to litigate against and antagonize because of the disputes generated by its own lawyer's malpractice in drafting or negotiating the contract.
If the "case within a case" approach were applied in this case, the parties and eventually the jury would be required to struggle with hypothetical scenarios along the following lines: Ignoring what has happened since the negotiations, would the party on the other side of the negotiating table from plaintiff now admit it would have agreed on that earlier occasion to a more favorable version of contract term X than it did? If not, would it have done so if plaintiff had adopted a position more favorable to the other party on term Y? If so, would plaintiff actually have offered a more favorable term Y, or is it only saying it would now because it knows the adverse possibility that particular term protected against never happened? And if the opposing party was unwilling to give plaintiff everything it wanted on contract term X, would that party nonetheless been willing to give the plaintiff some or most of what it sought? And, if the other party would not have accepted a critical term the plaintiff believed was in the contract, because plaintiffs attorney said it was, would the plaintiff have signed the contract? The litany could continue, but the point is made.
Accordingly, the highly simplistic and formalized case within a case method of proving litigation malpractice simply does not lend itself to this particular transactional malpractice case and ones like it. In the context of litigation malpractice the "trial within a trial" approach is designed to substitute objective evidence for "pure speculation and conjecture."[21] In the context of the sort of transactional malpractice involved in this case, that approach does the opposite: it would introduce unprecedented layers of pure speculation and conjecture into the trial of the malpractice action.

*437 2. Appellants Rely on Inapposite Authority to Support Their Contention the "Case Within a Case" Requirement Applies to Mandate Respondents Prove They Could Have Obtained The Contract Terms They Sought (and Thought They Had Received) If Appellants Had Not Committed Malpractice. In support of their "better deal" contention, appellants rely on two cases involving settlement negotiations in the litigation context. They also rely on language in a treatise on attorney liability and the non-California authority cited therein. As we shall explain, these authorities are inapposite.
In Marshak v. Ballesteros[22] a husband sued his attorney for malpractice, alleging the defendant attorney advised him to settle his marital dissolution matter for less than the matter was worth.[23] Division 5 of this court affirmed the trial court's granting of summary judgment based on plaintiffs failure to establish he suffered any damages as a result of the alleged malpractice.[24] It held "In order to prevail in his legal malpractice action, plaintiff must prove that the dissolution action would have resulted in a better outcome had defendant recommended that he reject the settlement offer. Plaintiff must prove what that better outcome would have been.... [¶] ... [¶] Here, plaintiff simply alleges that the case was worth more than he settled it for. He proffered no evidence to establish the value of his case, other than his own declaration that the family residence was worth more, and the accounts receivable were worth less, than they were valued at for the purposes of settlement."[25] This was insufficient, therefore summary judgment was properly granted.
The foregoing holding in Marshak merely states the well-settled law of this state, which requires plaintiffs to present some evidence of damages. However in urging the application of this case to the transactional malpractice context, appellants rely on the following dicta: "Even if [plaintiff] were able to prove [the value of his case], however, he would not prevail. For he must also prove that his ex-wife would have settled for less than she did, or that, following trial, a judge would have entered judgment more favorable than that to which he now stipulated. Plaintiff has not even intimated how he would establish one or the other of these results with the certainty required to permit an award of damages." [26]
Appellant contends this statement in Marshak[27] constitutes an endorsement of the "better deal" approach in all cases of what the parties characterize as "transactional malpractice by omission." We cannot agree because although Marshak involved alleged malpractice in the course of a negotiation, the negotiation was conducted in the context of an ongoing lawsuit, and the plaintiff, unlike the respondents in this case, always had the option of trying his case. Thus while the approach suggested in Marshak is workable in the context of an alleged botched litigation settlement, it does not apply to cases of botched ordinary business transactions.
*438 Appellants also point to Blecher & Collins v. Northwest Airlines, Inc.,[28] another case involving alleged malpractice in the settlement of litigation involving Northwest Airlines and United Airlines. In Blecher & Collins, the plaintiff Northwest Airlines alleged the attorney defendants had an undisclosed conflict of interest which caused damage to the plaintiff by rendering the attorneys' representation of Northwest "`less effective'" than it would have been absent the conflict.[29] Northwest settled the underlying lawsuit for a disappointing sum and sought damages from the defendants.[30] The trial court held Northwest "must present evidence from which a reasonable jury could find that [the attorneys'] alleged failure to disclose the alleged conflict caused Northwest to ... obtain a disappointing United settlement."[31] The trial court held summary judgment in favor of the attorneys was appropriate because "Northwest offers no testimony of any United executive who participated in the settlement negotiations suggesting that Northwest could have obtained a more favorable settlement. [Northwest general counsel] Thornton, an attorney with twenty years of experience and a top northwest executive, ... still believes that he obtained `the last dollar or close to the last dollar' that United was going to offer.... In sum, no evidence suggests that either Thornton or United would have behaved any differently but for B & C's alleged failure to disclose the alleged conflict. No reasonable trier of fact could find that B & C's alleged failure to disclose a conflict caused Northwest to obtain an unfavorable settlement."[32]
In addition to the fact it, too, arises in the context of litigation, Blecher & Collins is easily distinguishable from this case because there, the claimed malpractice had nothing to do with the settlement negotiations, and indeed the defendant attorneys apparently were not involved in those negotiations at all.[33] As the court noted, "No evidence suggests that Thornton came to the bargaining table armed with purportedly false information ... and, therefore, discounted the value of Northwest's claim."[34] In this case, by contrast, respondents do indeed contend appellants' malpractice caused them to come to the bargaining table armed with false information about the agreement they were signing.
Because they both deal with malpractice related to litigation matters, neither Marshak nor Blecher & Collins supports adoption of the rule appellants urge on this court.
We also are not persuaded by the treatise appellants cite. Mallen & Smith, in Legal Malpractice, do indeed state "Proof of causation requires analysis of the consequences of proper advice. Thus, the client needs to prove what should have been achieved had the `proper' advice been given. If the alleged error is the failure to obtain or advise of a provision, concession *439 or benefit, the client must prove that the other party would have agreed."[35] To support this sweeping statement, Mallen and Smith rely on only one case: the Virginia case of Hazel & Thomas, P.C. v. Yavari.[36]
In Hazel & Thomas, plaintiff Yavari was represented by Hazell & Thomas in the negotiation of a sales contract of a purchase of land from Kline.[37] The purchase ultimately fell through, and Yavari lost his $1 million deposit and suffered a damages judgment in favor of Kline.[38] Yavari subsequently filed suit against his attorneys, claiming they negligently failed to include certain terms in the sales contract which would have prevented his losses.[39] In reversing a judgment in Yavari's favor, the Supreme Court of Virginia held "Yavari had the burden of showing either that Kline would have agreed to include the above-listed provisions in the contract or that Yavari would not have signed the contract if Kline had refused to include them."[40] Because Yavari did not carry this burden, the Virginia Supreme Court found he failed to establish his damages were caused by the attorneys' negligence.[41]
The Mallen and Smith treatise and the Virginia Supreme Court failed to mention other cases and authorities which did not apply the traditional litigation malpractice case within a case approach in the transactional malpractice context. One such expert, Professor John Bauman, first examined the case law establishing the case within a case approach in litigation malpractice cases then in a passage he summarized the contrary case law in transactional malpractice cases. "When legal malpractice takes place in a transactional settingthat is, in the advising and planning of business dealingsthe courts take a much less structured approach to proof of damages. No longer wedded to a narrow interpretation of what can constitute adequate proof of the fact and amount of injury, the courts tend to treat such actions like ordinary business cases and allow considerably more flexibility to plaintiffs in proving their damages."[42]
Professor Bauman then proceeded to survey some of the cases supporting his basic distinction between litigation malpractice and transactional malpractice cases. "Where the connection between the [transactional] malpractice and the loss is clear, however, an attorney can be held liable for the amount of benefit the client hoped to realize from the legal services. In Gustavson v. O'Brien,[43] an attorney failed to assign a land contract to the entity that purchased insurance on the property. [Citation.] After a fire loss, the insurance company successfully defeated coverage by claiming that the entity that purchased insurance had no insurable interest *440 in the property, while the entity that owned the land had no insurance. [Citation.] The attorney was held responsible for the fire loss in addition to the costs and expenses paid by the client. [Citation.] In this case the loss of the anticipated benefit from the attorney's services is so closely connected to the malpractice that the award seems proper, once it is clear that the purchase of land and its insurance were matters entrusted to the attorney and thus subject to a duty of care and diligence. Similarly, when [in Bohn v. Johnson (N.D.1985) 371 N.W.2d 781] the attorney fails to structure a transaction so as to obtain a desired result, ... the attorney may be liable for the losses that predictably result. . . ."[44]
We are persuaded the cases and authority, including California authority, ranged against Virginia's Hazel & Thomas opinion are correct. As we have seen, business transactions generally involve a much larger universe of variables than litigation matters. In a contract negotiation, the number of possible terms and outcomes is often virtually unlimited. Even if the party on the other side of the table will not agree initially to a particular term, creative transactional attorneys can often gain agreement to the disputed term by sweetening the offer on other terms. Or they can achieve the same result through offsetting concessions on other issues. The jury would have to evaluate a nearly infinite array of "what-ifs", to say nothing of the many "if that, then whats," in order to determine whether the plaintiff would have ended up with a better outcome "but for" the malpractice. Each of these possible combinations of contract terms, in turn, could have led to different results, more or less favorable for the plaintiff depending on how events played out after the parties signed the contract. Moreover, unlike a litigation contest, in most contract negotiations neither party is locked into a historical event and thus remains free to abandon the negotiations and seek another deal elsewhere. Whether a plaintiff would have done so had their attorneys correctly advised them about the terms they had negotiated and what that would have meant to plaintiffs economic prospects would introduce yet another set of imponderable issues into the malpractice case.
Furthermore, as pointed out earlier,[45] trying to determine what the other side of the negotiations would have been willing to accept at the time of the negotiations consigns the parties and the court to a contest built on speculation and conjecture. Both sides to the negotiation, now in all probability bitter adversaries, would have to testify about what they would have done if presented with a vast array of hypothetical situations involving different combinations of terms and potential terms and conceivable terms. All the time they theoretically would be expected to ignore everything that had happened in the real world since they signed the contract, events which inevitably would have rendered some hard fought terms completely irrelevant and others of supreme importance. Accordingly, requiring the client to prove he or she would have prevailed in the negotiation, on the precise terms at issue in the malpractice action, would confound instead of contributing to the causation analysis.[46]
*441 There is yet another reason for rejecting proof of the "better deal" as an element of this particular malpractice action. As to several of the more important terms of this contract the Viners allege appellants misled them about what the contract providedand also produced evidence supporting this claim. In some instances, the Viners had emphasized certain provisions were crucial to them and appellants assured them the contract gave them what they wanted. Yet in fact the contract did not do so. By misleading the Viners in this way, appellants deprived these plaintiffs of the opportunity to find out whether MEI indeed would have accepted the terms they preferredor even of the chance to trade other terms in order to obtain what was most important to them. Furthermore, it deprived the Viners of the opportunity to gain reliable contemporary evidence of what MEI was or was not willing to accept as to those crucial terms of the contract.
To require the Viners to prove a "better deal" element in the malpractice action would allow appellants to tell the Viners they had obtained certain favorable terms in the contract appellants advised them to sign, then claim those terms were unattainable when it turns they are not present in that contract. Furthermore, it would allow appellants through their concealment, to deny the Viners the only reliable, contemporary evidence about the deal MEI actually was willing to accept, then relegate them to speculative answers to hypothetical situations seeking to prove what MEI would have accepted, which evidence they would have to extract from adversarial witnesses several years later.[47] For these, as well as the other reasons explained above, we are not inclined to do so.

3. This Transactional Legal Malpractice Case Should Be Governed by Ordinary Negligence and Causation Principles.

Once we depart from the litigation-specific case within a case methodology, we are left with the same principles of causation as would apply in any negligence action. The California Supreme Court has repeatedly held "the loss or diminution of a right or remedy constitutes injury or *442 damages."[48] It has further held "Neither uncertainty of amount nor difficulty of proof renders that injury speculative or inchoate."[49] The jury in this case found appellants' negligence caused the Viners to suffer a loss or diminution of their rights and remedies with respect to Dove as to each of the claimed items of malpractice. As we shall see below, this finding was supported by substantial evidence. In light of the nature of transactional malpractice in general and this transaction in particular, the trial court did not err in failing to require the Viners to prove they could have obtained a "better deal" on the terms in question.
This approach is illustrated in Fiorentino v. Rapoport,[50] a Pennsylvania case with facts similar to those in the present case. In Fiorentino, Fiorentino sued his attorney for legal malpractice relating to the sale of Fiorentino's business, known as J & R. Fiorentino testified "he told the defendants that his primary concern was receiving all the money owed to him for the sale of his interest in J & R. Furthermore, Fiorentino testified that he specifically instructed the defendants that he wanted them to draft the agreement of sale `to make sure I got paid.'"[51] Despite these instructions, the documents drafted by the attorneys permitted the purchaser of the business to avoid payment by transferring assets away from J & R and into a corporation owned by his family members, thus bankrupting J & R and eliminating the resources from which the payments were to be made to Fiorentino.[52] The trial court granted nonsuit on the ground Fiorentino had failed to prove harm.[53]
The Pennsylvania Superior Court (the state's intermediate appellate court) reversed, answering in the negative the question "should a legal malpractice plaintiff be required to demonstrate with absolute certainty what would have happened in circumstances that the defendant lawyers did not permit to come to pass by their actions and omissions?"[54] In so holding, the court noted the trial judge improperly "melded the separate considerations of proximate causation, quantification of damages, and collectibility into one issue."[55] In its analysis, the appellate court separated those considerations and held Fiorentino had adequately established proximate causation.
First, the court held "[e]vidence which demonstrates that a plaintiff has suffered the loss of property rights under a contract will suffice to establish `actual injury' or `harm' in a legal malpractice action. [Citation]"[56] It went on to explain the question of whether that harm is caused by the defendants' malpractice is essentially, *443 a policy question. It noted "the question of `proximate' causation ... becomes essentially a question of whether the policy of the law will extend the responsibility for the conduct to the consequences which have in fact occurred. Quite often this has been stated, and properly so, as an issue of whether the defendant is under any duty to the plaintiff, or whether his duty includes protection against such consequences. [Citation.] Thus, a defendant will not be found to have had a duty to prevent a harm that was not a reasonably foreseeable result of the prior negligent conduct. The rationale behind this rule is that it would be unfair to impose a duty upon persons to prevent a harm that they could not foresee or avoid. [Citation.]"[57] Applying this causation analysis to the case before it, the court determined testimony by Fiorentino's expert "would support the inference that Mr. Converse was able to easily and lawfully force J & R into bankruptcy because cross-appellants failed to draft the agreement of sale for J & R in such a way as to adequately protect Mr. Fiorentino's interests. Thus, a jury could conclude that the quality of the legal services was the proximate cause of J & R's bankruptcy."[58] Accordingly, the judgment of nonsuit was reversed.
While our research has not yielded any California cases with facts as similar to those before us as the facts in Fiorentino, our review of California law persuades us a similar analysis and result are appropriate in this case. Under California law, "the legal malpractice suit is but one variety of negligence action, governed by the general doctrines of pleading and proof prevailing in negligence actions. [Citations.]"[59] Therefore, "An attorney's liability, as in all other negligence cases, is for all damages directly and proximately caused by his negligence."[60] This question will normally be decided by the jury: "Given a breach of duty by the defendant, the decision whether that breach caused the damages (that is, causation in fact) is again within the jury's domain."[61]

B. The Legal Malpractice Plaintiff is Not Required to Prove the Attorney's Negligence Was the Sole Cause of the Loss, Therefore the Jury in This Case Was Properly Instructed on Causation.

California courts have long recognized "the attorney's negligence, whether consisting of active conduct or a failure to act, need not be the sole cause of the client's loss. [Citations.]"[62] To the contrary, in Modica v. Crist,[63] the Court of Appeal rejected the argument the client must show "but for" causation in all legal malpractice actions. To the contrary, it held "This `but for' clause is merely one way of *444 expressing the requirement that negligence to be actionable must be a proximate cause of the injury. [Citations.] The words [`but for'] do not connote a requirement that the attorney's negligence be the sole cause or that the complaint must negative any other cause."[64] The court in Modica concluded the proper standard is "the formula suggested by Prosser in `Proximate Cause in California,' 38 C.L.R. 369, 378: `The defendant's conduct is a cause of the event if it was a material element and a substantial factor in bringing it about. Whether it is such a substantial factor is for the jury to determine, unless the issue is so clear that reasonable men cannot differ.'"[65]
In this case, the jury was properly instructed on the "substantial factor" theory of causation.[66] In contesting this instruction, appellants rely heavily on Mattco Forge v. Arthur Young & Co., in which the Court of Appeal held the trial court erred in giving instructions similar to those given in this case, rather than requiring the plaintiff to prove a "case-within-a-case."[67] However, Mattco Forge does not aid appellants. Instead, it supports our conclusion the case within a case methodology is specific to litigation-related professional malpractice: "Mattco's lawsuit was based on Arthur Young's malpractice in allegedly negligently providing accounting litigation support services, thereby ruining Mattco's federal lawsuit against GE, resulting in the loss of Mattco's legal claim. Thus, Mattco's cause of action is analogous to a malpractice case in which an attorney is accused of losing a plaintiffs case through negligence, and the same evidentiary burden applies. Therefore, in order to prevail against Arthur Young in this action, Mattco has the burden to establish that had Arthur Young properly handled the underlying case, Mattco would have prevailed against GE."[68] As we have seen, this causation burden has no application in this case of transactional malpractice.
Significantly, the court in Mattco Forge recognized "the trial court correctly instructed the jury with BAJI No. 3.76 to the effect, `[a] cause of injury, damage, loss or harm is something that is a substantial factor in bringing about an injury, damage, loss, or harm.' [H] At the same time, the jury was advised that if it found harm, it would be asked in the next phase `to determine the extent of the harm suffered by plaintiffs and the amount of damages to be awarded to plaintiffs.'"[69] These instructions were held to be erroneous only because they failed to reflect the case within a case methodology. Because the methodology has no application to this case, we find no instructional error.

II. THE DAMAGES AWARDED BY THE JURY WERE SUPPORTED BY SUBSTANTIAL EVIDENCE, WITH THE EXCEPTION OF DAMAGES RELATING TO THE PROPOSED FORSYTHE AND HIGGINS PROJECTS.[**]

DISPOSITION
The judgment is modified to reduce the total amount thereof by $5,205,800 ($4.29 *445 million non-solicitation damages attributable to Frederick Forsythe project and $915,800 noncompetition damages attributable to Jack Higgins project). The judgment in the resulting amount of $8,085,732 is affirmed. The parties shall bear their own costs on appeal.
We concur: LILLIE, P.J., and WOODS, J.
NOTES
[*] Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part II.
[1] Nestle v. City of Santa Monica (1972) 6 Cal.3d 920, 925-926, 101 Cal.Rptr. 568, 496 P.2d 480.
[2] Dove was later renamed NewStar Media, however we refer to it as "Dove" for the sake of clarity.
[3] Section 1.10 provides: "Viner and Raffin will not directly or indirectly contract with, hire, solicit, encourage the departure of or in any manner engage or seek to employ any author or, for the purposes of audio books, reader, currently under contract or included in the Company's book or audio catalogues for a period of four years; provided that (i) nothing herein shall prevent Viner from acting as agent for (A) any author or reader under contract to the Company or in the Company's audio or book catalogs on the date hereof if Viner was acting as agent for such author or reader on the date hereof; and (B) persons who are not currently under contract or in the Company's book or audio catalogues, but he may only act as agent to any such person for audio purposes if such representation is ancillary to substantial representation by Viner for such person in other areas, and (ii) after 24 months from the date hereof Viner and Raffin shall be free to contract with any author or reader under contract with the Company or in the Company's catalogs for books only; and provided further that Viner may represent."
[4] Section 1.8 provides: "Viner and Raffin will not `compete' in any way, directly or indirectly, in the audio book business for a period of four years, without the prior written consent of the Company. For the purposes of this Agreement, the term `compete' includes engaging in, assisting (financially or otherwise) or performing services in connection with the audio book business, including, without limitation, whether such engagement, assistance or performance is as an officer, director, proprietor, employee, partner, stockholder or other investor (other than as a holder of less than 5% of the outstanding capital stock of a publicly traded corporation), creditor, guarantor, consultant, advisor, agent, sales representative or other participant, in any county or any other political subdivision of any state in the United States of America or any of its possessions or territories where the Company conducted such business at any time during the five year period preceding the date hereof. All of the parties agree that the duration and area for which the covenant not to compete set forth in this Agreement is to be effective are reasonable. In the event that any court determines that the time period or the geographical areas provided for in this Agreement, or both of them, are unreasonable and that such coverage is to that extent unenforceable, such covenant shall be deemed to be a series of separate covenants, one for each and every state of the United States of America and for any other territory or possession of the United States of America where this covenant is intended to be effective. The parties agree that damages would be an inadequate remedy for the Company in the event of a breach or threatened breach of this covenant and thus, in any such event, the Company may, either with or without pursuing any potential damages remedies and in addition to such remedies, immediately obtain and enforce an injunction, and/or a temporary restraining order, prohibiting Viner or Raffin from violating this covenant, without having to prove actual damages or post bond."
[5] Section 16600 of the Business and Professions Code provides: "Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."
[6] The instruction as given provided: "Witnesses who have special knowledge, skill, experience, training or education in a particular subject have testified to certain opinions. Any such witness is referred to as an expert witness. In determining what weight to give any such opinion, you should consider the qualifications and believability of each expert witness, the facts or materials upon which each opinion is based, and the reasons for each opinion. [¶] An opinion is only as good as the facts and reasons on which it is based. If you find that any fact on which the expert witness relies has not been proved, or has been disproved, you must consider that in determining the value of the opinion. Likewise, you must consider the strengths and weaknesses of the reasons on which it is based. [11] You are not bound by an opinion. Give each opinion the weight you find it deserves."
[7] We agree with appellants' statement "although the causation portion of W & C's appeal is in form primarily a substantial evidence challenge, it raises in substance a pure issue of law."
[8] Budd v. Nixen (1971) 6 Cal.3d 195, 98 Cal. Rptr. 849, 491 P.2d 433.
[9] Budd v. Nixen, supra, 6 Cal.3d at p. 200, 98 Cal.Rptr. 849, 491 P.2d 433.
[10] Sukoff v. Lemkin (1988) 202 Cal.App.3d 740, 744, 249 Cal.Rptr. 42. See also, Mattco Forge, Inc. v. Arthur Young & Co. (1997) 52 Cal.App.4th 820, 844, 60 Cal.Rptr.2d 780 (failure to conduct "trial-within-a-trial" constitutes reversible error); Williams v. Wraxall (1995) 33 Cal.App.4th 120, 131, 39 Cal. Rptr.2d 658 ("to prevail, respondent was essentially obligated to `retry' his criminal case and establish that he would have prevailed in the absence of appellants' negligence"); Thomas v. Lusk (1994) 27 Cal.App.4th 1709, 1716, 34 Cal.Rptr.2d 265 ("To prevail, appellant essentially was obligated to `retry' the products liability action"); Norton v. Superior Court (1994) 24 Cal.App.4th 1750, 1758, 30 Cal.Rptr.2d 217 (litigation malpractice action is "the trial of a `suit-within-a-suit'").
[11] California State Automobile Association Inter-Insurance Bureau v. Parichan, Renberg, Crossman & Harvey (2000) 84 Cal.App.4th 702, 101 Cal.Rptr.2d 72 (hereinafter CSAA).
[12] CSAA, supra, 84 Cal.App.4th at pp. 709-710, 101 Cal.Rptr.2d 72.
[13] CSAA, supra, 84 Cal.App.4th at pp. 706-707, 101 Cal.Rptr.2d 72.
[14] CSAA, supra, 84 Cal.App.4th at p. 708, 101 Cal.Rptr.2d 72.
[15] CSAA, supra, 84 Cal.App.4th at p. 708, 101 Cal.Rptr.2d 72.
[16] CSAA, supra, 84 Cal.App.4th at p. 708, 101 Cal.Rptr.2d 72.
[17] CSAA, supra, 84 Cal.App.4th at pp. 709-710, 101 Cal.Rptr.2d 72.
[18] CSAA, supra, 84 Cal.App.4th at p. 710, 101 Cal.Rptr.2d 72.
[19] CSAA, supra, 84 Cal.App.4th at p. 711, 101 Cal.Rptr.2d 72.
[20] CSAA, supra, 84 Cal.App.4th at p. 711, 101 Cal.Rptr.2d 72.
[21] "`This trial within a trial avoids the specter that the damages claimed by a plaintiff are a matter of pure speculation and conjecture.'" (CSAA, supra, 84 Cal.App.4th at p. 710, 101 Cal.Rptr.2d 72.)
[22] Marshak v. Ballesteros (1999) 72 Cal. App.4th 1514, 86 Cal.Rptr.2d 1.
[23] Marshak, supra, 72 Cal.App.4th at p. 1516, 86 Cal.Rptr.2d 1.
[24] Marshak, supra, 72 Cal.App.4th at p. 1518, 86 Cal.Rptr.2d 1.
[25] Marshak, supra, 72 Cal.App.4th at pp. 1518-1519, 86 Cal.Rptr.2d 1.
[26] Marshak, supra, 72 Cal.App.4th at p. 1519, 86 Cal.Rptr.2d 1, italics omitted.
[27] Marshak, supra, 72 Cal.App.4th 1514, 86 Cal.Rptr.2d 1
[28] Blecher & Collins v. Northwest Airlines, Inc. (C.D.Cal.1994) 858 F.Supp. 1442 (hereafter Blecher & Collins).
[29] Blecher & Collins, supra, 858 F.Supp. at pp. 1451-1452.
[30] Blecher & Collins, supra, 858 F.Supp. at p. 1457.
[31] Blecher & Collins, supra, 858 F.Supp. at p. 1457.
[32] Blecher & Collins, supra, 858 F.Supp. at p. 1459.
[33] Blecher & Collins, supra, 858 F.Supp. at p. 1458 ("According to Thornton, the settlement was `[exclusively my deal.'").
[34] Blecher & Collins, supra, 858 F.Supp. at p. 1458.
[35] 3 Mallen & Smith, Legal Malpractice (5th ed.2000) § 23.5, p. 512.
[36] Hazel & Thomas, P.C. v. Yavari (1996) 251 Va. 162, 465 S.E.2d 812 (hereinafter Hazel & Thomas ).
[37] Hazel & Thomas, supra, 465 S.E.2d at p. 813.
[38] Hazel & Thomas, supra, 465 S.E.2d at p. 814.
[39] Hazel & Thomas, supra, 465 S.E.2d at p. 814.
[40] Hazel & Thomas, supra, 465 S.E.2d at p. 815.
[41] Hazel & Thomas, supra, 465 S.E.2d at p. 815.
[42] Bauman, Damages for Legal Malpractice: An Appraisal of the Crumbling Dike and the Threatening Flood (1988) 61 Temp. L.Rev. 1127, 1154 (hereafter "Bauman").
[43] Gustavson v. O'Brien (1979) 87 Wis.2d 193, 274 N.W.2d 627.
[44] Bauman, supra, at p. 1155.
[45] See pages 435-437, ante.
[46] We need not and do not decide whether appellants could have raised an affirmative defense alleging respondents would have been unable to obtain contract terms more favorable than they received, even had respondents not committed malpractice. (This approach is advocated as a substitute for the "case within a case" element in litigation malpractice actions, in Kessler, Alternative Liability in Litigation Malpractice Actions: Eradicating the Last Resort of Scoundrels (2000) 37 San Diego L.Rev. 401.) For reasons explained above, we remain skeptical about the speculative evidence and conjecture this defense inevitably would introduce into the trial of the malpractice action. But we need not decide whether this defense should be allowed because appellants never asked the trial court to permit such a defense. Rather they focused entirely on their contention this should be an element of respondents' malpractice causes of action. At oral argument, appellants emphasized the respondents had the burden of proof if the court agreed with the principle they were urgingthat is, plaintiffs must prove the party with which they negotiated the contract would have given them more favorable contract terms had their attorneys not committed malpractice. This would mean, as appellants further emphasized at oral argument, that the jury would have had to decide in their favor even if the jurors disbelieved every word of the testimony from MEI's representatives when they claimed they would not have accepted terms favorable to respondents. On the other hand, had appellants asserted their view as an affirmative defense, however, they would have borne the burden of proof and with it the risk of non-persuasion had the jury failed to credit MEI's testimony.
[47] Even in a litigation malpractice case, Galanek v. Wismar (1999) 68 Cal.App.4th 1417, 81 Cal.Rptr.2d 236, the court rejected the "case within a case" requirement where the lawyer's malpractice had deprived the client of evidence important to proving he would have won the underlying litigation.
[48] Jordache Enterprises, Inc. v. Brobeck, Phleger & Harrison (1998) 18 Cal.4th 739, 744, 76 Cal.Rptr.2d 749, 958 P.2d 1062 (hereinafter Jordache Enterprises ), citing Adams v. Paul (1995) 11 Cal.4th 583, 590, 46 Cal. Rptr.2d 594, 904 P.2d 1205 (analyzing what constitutes "actual injury" for purposes of running of statute of limitations under Code of Civil Procedure section 340.6).
[49] Jordache Enterprises, supra, 18 Cal.4th at p. 744, 76 Cal.Rptr.2d 749, 958 P.2d 1062
[50] Fiorentino v. Rapoport (Pa.Super. 1997) 693 A.2d 208 (hereinafter Fiorentino ).
[51] Fiorentino, supra, 693 A.2d at p. 214.
[52] Fiorentino, supra, 693 A.2d at pp. 210-211.
[53] Fiorentino, supra, 693 A.2d at p. 214.
[54] Fiorentino, supra, 693 A.2d at p. 212.
[55] Fiorentino, supra, 693 A.2d at p. 216.
[56] Fiorentino, supra, 693 A.2d at p. 216. California law is the same. See Jordache Enterprises, supra, 18 Cal.4th at p. 744, 76 Cal. Rptr.2d 749, 958 P.2d 1062 ("The loss or diminution of a right or remedy constitutes injury or damage.").
[57] Fiorentino, supra, 693 A.2d at p. 217.
[58] Fiorentino, supra, 693 A.2d at p. 218.
[59] Starr v. Mooslin (1971) 14 Cal.App.3d 988, 999, 92 Cal.Rptr. 583 (hereinafter Stan).
[60] Smith v. Lewis (1975) 13 Cal.3d 349, 362, 118 Cal.Rptr. 621, 530 P.2d 589 (citation and internal quotation marks omitted).
[61] Starr, supra, 14 Cal.App.3d at p. 998, 92 Cal.Rptr. 583 (going on to note "but where reasonable men will not dispute the absence of causality, the court may take the decision from the jury and treat the question as one of law").
[62] Ishmael v. Millington (1966) 241 Cal. App.2d 520, 529, 50 Cal.Rptr. 592. See also John B. Gunn Law Corp. v. Maynard (1987) 189 Cal.App.3d 1565, 1570, 235 Cal.Rptr. 180 ("No one disputes that an attorney's negligence need not be the sole proximate cause of a client's loss to establish a case of malpractice.").
[63] Modica v. Crist (1954) 129 Cal.App.2d 144, 276 P.2d 614 (hereinafter Modica ).
[64] Modica, supra, 129 Cal.App.2d at p. 147, 276 P.2d 614.
[65] Modica, supra, 129 Cal.App.2d at p. 148, 276 P.2d 614.
[66] See Starr, supra, 14 Cal.App.3d at p. 1002, 92 Cal.Rptr. 583 (jury instructions proper and adequate where they "clearly advised the jury that plaintiff could not recover unless she had proved by a preponderance of the evidence that [the] defendant's negligence was a proximate cause of her injury").
[67] Mattco Forge v. Arthur Young & Co. (1997) 52 Cal.App.4th 820, 60 Cal.Rptr.2d 780 (hereinafter Mattco Forge).
[68] Mattco Forge, supra, 52 Cal.App.4th at p. 837, 60 Cal.Rptr.2d 780.
[69] Mattco Forge, supra, 52 Cal.App.4th at p. 843, 60 Cal.Rptr.2d 780.
[**] See footnote *, ante.